**HAROLDS CLUB, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 19265.**

United States Court of Appeals
Ninth Circuit.

Jan. 19, 1965.

Kent & Brookes, and Valentine Brookes, San Francisco, Cal., for petitioner.

John B. Jones, Acting Asst. Atty. Gen., Lee A. Jackson, David O. Walter, and William A. Friedlander, Attys., Dept. of Justice, Tax Division, Washington, D. C., for respondent.

Before POPE, HAMLEY and KOELSCH, Circuit Judges.

HAMLEY, Circuit Judge.

This petition to review a decision of the Tax Court brings into question business expense deductions of Harolds Club, a Nevada corporation, claimed in its federal income tax returns for the years 1952 to 1956.

In those years Harolds Club paid Raymond I. Smith (Smith) an annual salary of ten thousand dollars plus twenty percent of the net profits of the company for each of the years in question. The salaries so computed ranged in amount from $350,201.20 to $557,559.57 for each

such year. In its income tax returns Harolds Club claimed the full amount of these annual salaries as business expense deductions under section 23(a) (1) (A) of the Internal Revenue Code of 1939 (1939 Code) and section 162(a) (1) of the Internal Revenue Code of 1954 (1954 Code), 26 U.S.C. § 162(a) (1) (1958).

The Commissioner of Internal Revenue disallowed such part of these deductions as exceeded one hundred thousand dollars for any one year. In redetermination proceedings, the Tax Court modified the Commissioner's ruling, allowing a deduction of ten thousand dollars plus fifteen percent of the net income. Harolds Club has petitioned to review that decision, asserting that the full amount claimed in the tax returns should have been allowed as business expense deductions.

Many of the facts were stipulated and the findings of fact of the Tax Court, including the finding that ten thousand dollars plus fifteen percent of the net profits was reasonable compensation to Smith for the years 1952 to 1956, are not here questioned. We here record only the most important of these facts, although we have taken all of them into consideration in reaching our decision.

Prior to 1935, Smith had engaged in various gaming operations in California. His son, Harold, who was twenty-five years old in that year, had worked for his father in some of these ventures. Smith dominated Harold most of his life, and Harold usually acquiesced when Smith sent him to work in one of his gaming locations.

In 1934, law enforcement officers closed Smith's gaming concession in Modesto, California, and Smith decided to relocate the family gaming operations in an area where gambling was legal. In January, 1935, he and Harold went to Reno, Nevada, to investigate the possibility of establishing a gaming business in that area. As a result Smith, Harold and Smith's other son, Raymond, then twenty-seven years of age, each contributed funds for the establishment of a Reno gaming business. Harold executed a

lease for the premises, and the business, known as Harolds Club, was operated as a sole proprietorship, with Harold as owner. Smith's contribution of approximately two thousand dollars was repaid to him about eighteen months later.

At first the business did not prosper and so it was decided that Smith, who had returned to California, should take over the management of Harolds Club. This he did in July, 1935, Harold and Raymond becoming dealers. When Harolds Club began to expand the sons became floor managers. In 1938, at Smith's suggestion, Harold gave a one-third interest in the club to Raymond, a partnership agreement between the two being entered into at that time.

At the outset, Smith was paid a salary, plus a bonus which was determined at the end of each year. In the early part of January, 1941, Smith and his sons decided upon a fixed percentage arrangement, Smith suggesting that he be paid twenty percent of the profits. Since Smith was running the club at this time and was the "brains" of the organization, his sons had no objection. Percentage employment contracts were not uncommon in the gaming business. On January 15, 1941, Smith and his sons entered into a formal written contract, under which Smith would receive an annual salary of ten thousand dollars plus twenty percent of the yearly net profits accruing from the operation of the club.

Under Smith's management the club prospered and became one of the largest gaming operations in Nevada. This was due largely to various promotional and operational devices conceived by Smith and adapted to the business.

Prior to 1942, Harolds Club had no bar. In that year, at Smith's suggestion and over the initial opposition of his sons, such facilities were installed. They became the personal operation of Smith and all profits derived therefrom were his. At a later date, Smith transferred ownership of these facilities to his wholly-owned corporation, Raymond I. Smith, Inc. By 1956, that corporation had installed seven bars in the club. He paid no rent to Harolds Club for the space which they occupied, but their operation helped, to some extent, the gaming business.

In 1940, Smith purchased the St. Charles Building, where Harolds Club was located, and transferred it to Harold. In 1943, at Smith's suggestion, Harold transferred this building to Raymond. In 1947, Raymond transferred it to his wholly-owned corporation, the St. Charles Building Corporation. In 1944, Smith acquired the lease to property adjacent to the St. Charles Building. He then sublet these premises to Harolds Club on a year-to-year basis. Smith subsequently transferred his prime lease on the adjacent property to his corporation, Raymond I. Smith, Inc. During the years 1952 to 1956, Harolds Club paid that corporation an annual rental of sixty thousand dollars.

On December 31, 1946, Harolds Club, a partnership, was transferred in its entirety to Harolds Club, Inc., in exchange for all of the latter's stock and notes. The stock and notes were issued two-thirds to Harold and one-third to Raymond. On the same day Harolds Club, Inc., entered into an agreement with Smith continuing his employment under substantially the same terms and conditions that had existed since 1941.

Because Harold was then experiencing marital difficulties, a voting trust agreement was entered into on January 2, 1947. Smith, Harold and Raymond were the trustees of the voting trust which contained all of the stock of Harolds Club, Inc. This agreement, expired on January 2, 1953. On January 22, 1947, Harold was divorced by his wife. Under the property settlement which they entered into, she became the owner of one half of his stock in Harolds Club.

In 1953 Harolds Club took possession of additional contiguous property which it had purchased in 1941. A short time later in 1953 Smith recommended that the building on this property be torn down and a new structure erected. Harold opposed the plan, but Raymond agreed with his father and the project was car-

ried out. Construction of the new building was completed in 1955.

By 1952, Harolds Club was employing approximately eight hundred people. Harold was then an assistant manager and Raymond was in the bookkeeping department. The club also employed a business manager and a casino manager, both of whom reported directly to Smith. On several occasions between 1941 and 1956, one or the other of the three Smiths proposed to expand gaming activities into other areas. A majority vote decided against each of the proposals, Smith sometimes thereby getting his way, and sometimes not.

In 1956, a contract for the sale to third parties of the outstanding stock of Harolds Club, St. Charles Building Corporation, and Raymond I. Smith, Inc. was executed, the sale price to be $9,500,000. The buyer subsequently defaulted and Smith, Harold, Raymond and Harold's former wife divided among themselves the forfeited three hundred thousand dollar deposit.

For the tax years 1952 through 1956 the annual net income of Harolds Club ranged from $1,367,029.88 to $2,098,906.01. The amounts paid to Smith for those years have already been indicated. Harold and Raymond each received salaries of from sixty thousand to seventy-five thousand dollars a year during this period.

Competitors testified that, in their opinion, the salary contract between Smith and Harolds Club was reasonable, and that he was worth all that was paid to him. As before noted however, Harolds Club does not here challenge the Tax Court's implicit finding that annual amounts paid to Smith in excess of ten thousand dollars plus fifteen percent of yearly net profits constituted unreasonable compensation for the years 1952 to 1956.

Petitioner predicates its claimed business expense deductions for the entire amounts paid to Smith during these years upon section 162(a) of the 1954 Code and section 23(a) (1) (A) of the 1939 Code.[1] Since the amount of compensation was contingent upon the amount of net profits of the business, petitioner also relied on Treasury Regulations 111, § 29.23(a)6 and Treasury Regulations 118, § 39.23(a) (6) for the years 1952 and 1953, and Treasury Regulations § 1.162-7(b) for the remaining years.[2]

Under the quoted regulations contingent compensation, generally speaking, should be allowed as a deduction even though it may prove to be greater than the amount which would ordinarily be paid, if paid pursuant to a "free bargain"

1. Section 162(a) of the 1954 Code, which is substantially the same as section 23 (a) (1) (A) of the 1939 Code, reads, in part, as follows:

"(a) In general.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

"(1) a reasonable allowance for salaries or other compensation for personal services actually rendered;
* * *."

2. Regulation § 1.162-7(b) (2) and (3), which is substantially the same as the earlier regulations relied upon, provides, in part:

"(2) * * * Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made be-

fore the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid.

"(3) In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the contract is questioned."

between the employer and the individual, and if the contract for compensation was reasonable under the circumstances "existing at the date when the contract for services was made."

The Tax Court determined that the amount paid to Smith as compensation in the years 1952 to 1956, under the contract for contingent compensation, was greater than the amount which would ordinarily be paid in those years, a conclusion which is not here disputed. The Court then proceeded to determine whether the deduction was nevertheless allowable under Regulation § 1.162–7(b), because such compensation resulted from a "free bargain" which, when entered into, was reasonable. It concluded that the 1941 salary agreement was not the result of a "free bargain" within the meaning of the quoted regulation, and that therefore reasonableness must be judged as of the time the compensation was paid. In reaching this conclusion the Court placed primary reliance upon the family relationship between Smith and his employers in 1941, and circumstances indicating that he dominated them at that time.[3]

In contesting this conclusion petitioner first points out that the Commissioner, after audit, agreed that the salaries paid to Smith under the 1941 formula in the years 1941 through 1949 were reasonable. Petitioner reasons from this that if the contract was reasonable and entitled to recognition when the owners-sons were younger and more likely to be dominated by their father than when they themselves were over forty, " * * * it would seem that logically the contract would not become unreasonable as the domination abated."

The precise question before us, however, is not as to the Tax Court determination concerning the reasonableness of the contract at any particular time, but as to its determination that the contract was not the result of a "free bargain" in 1941. The Internal Revenue Service had no occasion to look into the latter question until it first determined that the compensation was unreasonable for a particular tax year. Since the agency determined that the compensation was in fact reasonable · for the years 1941 through 1949, it made no determination for those years as to whether the 1941 contract resulted from a "free bargain." [4]

Petitioner next contends that the Tax Court erred in attributing adverse significance to the family relationship between Smith and the 1941 owners of the business, in view of the fact that the owners-sons were adults and legally competent.

The question of whether the 1941 compensation agreement resulted from a "free bargain," is one of fact. In determining that question all circumstances bearing upon the ability of the employer to exercise a free and independent judgment are relevant.

One such circumstance is family relationship. The fact that Harold and Raymond were competent adults at the time they entered into the 1941 contract tends to minimize the significance which should be attached to the fact, standing alone, that they were the sons of Smith. But

---

3. The Tax Court said, in part:
   "In view of the family relationship existing between Harold and Raymond, the employers, and Smith, the employee; the ages and experience of the employers; Smith's domination over his sons in the past; the respective roles and duties of the sons and Smith in Harolds Club's creation and organization; and the reasons offered by Harold and Raymond for agreeing to Smith's 'suggested' compensation, we cannot say that petitioner has established that the original employment contract (1941) between Harolds Club and Smith was the product of a free bargain or arm's-length transaction."

4. Even if the reasonableness of Smith's compensation were here in question we fail to see how its solution is promoted by considering the likelihood that Smith's domination decreased as the years went by. Reasonableness of compensation for services depends upon the value of the services rendered. Under that test, compensation could be reasonable or unreasonable wholly apart from any factor of domination.

that fact did not stand alone. The record fully supports the Tax Court's finding that Smith dominated the sons, notwithstanding their adulthood and competency. Indeed, the latter finding is not challenged on this review. Where there is such domination, lack of ability to bargain freely may exist even as between competent adults.

Petitioner asserts that in concluding that the 1941 agreement did not result from a free bargain, the Tax Court applied a standard which is the exact and precise opposite of the correct standard. Petitioner asserts that the statute permitting business expense deductions is designed to prevent deduction for salaries in excess of the employee's true worth. The Tax Court therefore erred, petitioner urges, in accepting the Commissioner's argument that Smith's services were so essential to the success of his sons' business that the sons could not bargain with him on equal terms, hence the "bargain" was not "free." Under this reasoning, petitioner argues, only drones can bargain freely for their compensation.

Whatever the Commissioner may have argued in the Tax Court, we find no indication that the Court predicated its resolution of the "free bargain" question upon the theory that the sons felt obliged to enter into the 1941 agreement because of their belief that Smith's services were indispensable. The only court finding which might imply such a view is the statement that since Smith was running the club in 1941 and was the "brains" of the organization, his sons had no objection to the percentage arrangement. In our opinion this finding tends more to show that the sons surrendered their judgments to that of their father's because he exerted control rather than because he was indispensable.[5]

The Tax Court did consider the value of Smith's services in deciding what compensation for the years in question was reasonable. But the question now under discussion is the entirely different one of whether the 1941 contract resulted from a free bargain.

Petitioner argues, additionally, that apart from the above-discussed regulation pertaining to contingent compensation, the statute does not authorize the "double taxation" of payments made solely as compensation for personal services and not as disguised dividends or as the purchase price of property. By "double taxation" petitioner refers to the fact that Smith has paid personal income taxes on the full amount paid to him and, to the extent that such compensation is not allowed as a business expense deduction, petitioner must also pay a corporate income tax thereon.

Petitioner acknowledges that there is good reason to set reasonable bounds upon ostensible salaries paid to employees who are also shareholders or who are selling property to the corporation. Regulation § 1.162–7(b) (1), quoted in the margin, gives recognition to this need.[6]

5. As indicated in the Tax Court findings quoted in note 3, one of the factors which the Court took into account in determining that the 1941 bargain was not "free," was "* * * the reasons offered by Harold and Raymond for agreeing to Smith's 'suggested' compensation, * * *" We have examined that part of Harold's and Raymond's testimony contained in the excerpted record before us and find nothing therein to indicate that they agreed to the 1941 arrangement because of Smith's indispensability.

6. Regulation § 1.162–7(b) (1) provides as follows:

"(b) The test set forth in paragraph (a) of this section and its practical application may be further stated and illustrated as follows:

"(1) Any amount paid in the form of compensation, but not in fact as the purchase price of services, is not deductible. An ostensible salary paid by a corporation may be a distribution of a dividend on stock. This is likely to occur in the case of a corporation having few shareholders, practically all of whom draw salaries. If in such a case the salaries are in excess of those ordinarily paid for similar services and the excessive payments correspond or bear a close relationship to the stockholdings of the officers or employees,

But petitioner argues that Congress did not intend to authorize the Commissioner to sit in judgment on salaries paid to non-shareholders. This is true, petitioner reasons, because such salaries are, unless the disguised purchase price of property, paid solely to obtain personal services. No revenue purpose is served, petitioner urges, because the progressive tax structure on individuals goes higher than the corporate tax rate, consequently what is gained in corporate income taxes will be more than lost in reduced personal income taxes.

■ Whatever practical effect the disallowance of salary as a corporate business expense deduction may have upon the tax revenue,[7] the statute in question admits of no such qualification. Under section 162(a) (1) of the 1954 Code, only "reasonable" compensation is made deductible. Petitioner's thesis would read "reasonable" out of the statute, for it would sanction disallowance only where the payment was not compensation at all, but was really disguised dividends, property payments or gifts. The Tax Court, however, has been sustained in disallowing what was held to be unreasonable compensation which could not have been a dividend or purchase price of property. See Patton v. Commissioner, 6 Cir., 168 F.2d 28.

The fact that the regulation quoted in note 6 singles out cases where a salary is disallowed in part because it is a dis-

> it would seem likely that the salaries are not paid wholly for services rendered, but that the excessive payments are a distribution of earnings upon the stock. An ostensible salary may be in part payment for property. This may occur, for example, where a partnership sells out to a corporation, the former partners agreeing to continue in the service of the corporation. In such a case it may be found that the salaries of the former partners are not merely for service, but in part constitute payment for the transfer of their business."

guised dividend or payment for property does not alter the requirement that the salary must be reasonable to be deductible. The regulation purports only to give illustrative examples of the practical application of the Code and not to define the limits of its application.

Petitioner contends that to interpret and apply the Code section as is here done makes it a regulatory provision to control salary and wage scales. Congress, petitioner argues, intended no such regulation.

Section 162(a) (1) is designed to define which expenses are deductible. To the extent that a salary is unreasonable it is not deductible. The disallowance of a deduction for an unreasonable salary with resulting adverse tax effects to the business has a regulatory effect to the extent that it discourages the employer from disbursing, as salaries to employees what, if disbursed at all, should be distributed to such employees or others as dividends or gifts. But this regulatory effect is unavoidably incident to the tax scheme whereby only necessary business expenses may be deducted in calculating the employer's income tax.

Other arguments advanced by petitioner have been examined but are without merit.

The Tax Court's construction of the Code provisions and regulations is correct and its determination based thereon is affirmed.

7. Petitioner's argument as to the practical effect of the Tax Court ruling is open to question. Corporate net income withheld from disbursement as compensation for services, because in excess of reasonable compensation, would ordinarily be distributed, to a large extent, as dividends. To this extent it would be subject to both corporate and personal income taxes, whereas if disbursed as compensation for services, with an off-setting business expense deduction, it would be subject only to personal income taxes.