HENRY MILLER SPRING AND MANUFACTURING COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Henry Miller Spring & Mfg. Co. v. Commissioner
Docket No. 2635-74.
United States Tax Court
T.C. Memo 1975-323; 1975 Tax Ct. Memo LEXIS 51; 34 T.C.M. (CCH) 1400; T.C.M. (RIA) 750323; October 30, 1975, Filed D. L. Ketter,C. J. Queenan, Jr., and Peter H. Beaman, for the petitioner. Louis A. Boxleitner, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioner's Federal income tax in the amounts of $ 45,689 and $ 47,350 for its fiscal years ended March 31, 1969 and March 31, 1970, respectively, and by amendment to answer claimed additional deficiencies for these years of $ 26,282.35 and $ 30,499.38, respectively, making the total deficiencies in issue $ 71,971.35 and $ 77,849.38, respectively. Some of the issues raised by the pleading having been disposed of by the parties, the only issue remaining for our decision is whether the compensation paid by petitioner to its president and treasurer, Robert S. Russell, and its vice president and assistant secretary, Robert M. Hoel, is in excess of reasonable compensation for services, and, if so, what amount is properly deductible under section 162(a)(1), I.R.C. 1954, [1] as reasonable compensation for the services rendered by these officers. *53 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner, Henry Miller Spring and Manufacturing Company, is a corporation organized under the laws of Pennsylvania in 1947 for the purpose of engaging in the business of manufacturing and selling heavy-duty coil springs for railroad cars and other industrial uses. Petitioner's principal place of business at the time its petition in this case was filed was in Pittsburgh, Pennsylvania. Petitioner filed its corporate income tax returns on an accrual basis, and for fiscal years ended March 31. Its returns for its fiscal years 1969 and 1970 were filed with the Internal Revenue Service Center in Philadelphia, Pennsylvania. Henry Miller and Harold Russell were the founders of petitioner and initially each of these two individuals were issued 50 percent of petitioner's 600 shares of capital stock. Immediately after being issued his 300 shares of stock, Harold Russell transferred these shares to Railroad and Industrial Products Company, a corporation in which he owned all the stock. Prior to 1962 the total outstanding shares of petitioner were increased by stock dividends to 2,500 shares and at the *54 date of the trial of this case this was the number of outstanding shares of petitioner's stock. Until June 1962, Henry Miller and Harold Russell's wholly owned corporation each owned 1,250 shares of petitioner's stock. Prior to June 12, 1962, Henry Miller had decided to sell part of his stock in petitioner and, with the agreement of Harold Russell, had arranged a sale of 750 shares of his 1,250 shares. Before the sales agreement was executed, Harold Russell contacted his son, Robert S. Russell (Robert) to inquire whether Robert was interested in acquiring some of Henry Miller's stock. At that time Robert owned 90 percent of the stock of a corporation, Freight Car Building Supply Company (Freight Car), the remaining 10 percent of the stock of that company being owned by Robert M. Hoel. After being contacted by his father, Robert agreed to have Freight Car purchase 750 shares of Henry Miller's stock in petitioner at the price which had been negotiated for the sale of the stock to another person. On June 12, 1962, the 750 shares of petitioner's stock were purchased by Freight Car from Henry Miller. At the time Freight Car acquired a 30-percent stock interest in petitioner, Robert *55 was elected an executive vice president of petitioner. In 1965 Freight Car exercised an option it held to acquire all the stock of petitioner owned by Harold Russell's corporation. As a result of this acquisition, from 1965 through the date of the trial of this case Freight Car has owned a total of 80 percent of petitioner's outstanding capital stock. After the sale on June 12, 1962, by Henry Miller of 750 shares of petitioner's capital stock, he continued to own 500 shares, or 20 percent, of petitioner's outstanding capital stock until his death in 1964, at which time the 500 shares passed to various heirs of Henry Miller, including his wife, children, grandchildren and his son-in-law Peter E. Midock. During the year 1969, Elmer Miller, the son of Henry Miller, and Peter Midock, the son-in-law of Henry Miller, each owned 50 shares, or 2 percent, of petitioner's stock and during the year 1970 each owned 58 shares, or 2.3 percent, of petitioner's stock. These shares were all part of the 500 shares which had been owned by Henry Miller at the date of his death. Henry Miller was petitioner's president from the time of its organization until his death in November 1964. After the death *56 of Henry Miller, Robert became petitioner's president and has continued in that capacity throughout the years here in issue. Harold Russell, from approximately the time of petitioner's organization was its vice president and treasurer. He continued in the position of vice president and treasurer until his death in January 1966. Following the death of his father, Robert was elected treasurer of petitioner and, since February 1, 1966, to the date of the trial of this case, has held both the office of president and the office of treasurer of petitioner. Peter Midock had been employed by petitioner since 1951. On November 24, 1964, he was elected a vice president and director of petitioner and has served in those capacities to the date of the trial of this case. Petitioner's only plant is located in Sharpsburg, a suburb of Pittsburgh. During the years here in issue and for some years prior thereto, Midock was the general manager of petitioner's Sharpsburg plant and its office. He was assistant treasurer of petitioner from 1951 to the date of the trial of this case. Elmer Miller has been employed by petitioner since 1947. On November 24, 1964, he was elected vice president and *57 director of petitioner and has served continuously in those capacities to the date of the trial. Elmer Miller's office is at the Sharpsburg plant and during the years here in issue he was in charge of production at that plant. Robert Hoel, who for many years had been associated with Robert through various positions in corporations controlled by Robert, was elected a director of petitioner in June 1962. He was elected a vice president of petitioner in 1966, shortly after Harold Russell's death. Petitioner manufactures and sells heavy-duty hot wound coil springs. The principal customers for petitioner's product are railroad car manufacturers since the springs manufactured by petitioner are used primarily in railroad cars. However, during the years here in issue approximately 20 percent of petitioner's sales were to other industrial customers for use in mine cars, coke ovens, presses, shears, and other similar products. On April 25, 1950, petitioner's board of directors passed a resolution providing for Henry Miller, as president, to be paid an annual salary of $ 20,000 plus 10 percent of petitioner's gross profits before taxes and for its vice president and treasurer, Harold Russell, *58 to be paid an annual salary of $ 12,000 plus 5 percent of its gross profits before taxes. On March 6, 1953, petitioner established an employees' profit sharing plan which was amended in 1953 and 1965 and, as so amended, continued in effect during the years here in issue. The Internal Revenue Service has determined that the plan meets the requirements of section 401(a) and that the trust established thereunder is exempt from tax under section 501(a). Under the plan, petitioner makes an annual contribution to the trust which is allocated among eligible participants in the proportion of the total compensation of that participant for the year to the total compensation of all participants in the plan for the year. On March 4, 1953, petitioner's directors passed a resolution providing that its president would be paid a bonus of 10 percent of petitioner's pre-tax net income and its vice president and treasurer would be paid a bonus of 5 percent of its pre-tax net income. Petitioner's business is competitive. Its major competitiors during the years here in issue were divisions of large conglomerates. Of its four major competitors, three are divisions of conglomerates with total gross sales *59 near the billion dollar mark and one is a division of a smaller conglomerate. Two of petitioner's major competitors had their headquarters in Chicago and a third had its largest sales agency in Chicago. Petitioner's fourth major competitor handled its sales to railroads throughout the entire country with one salesman traveling out of Pittsburgh. The springs made by petitioner for use in railroad cars are used on the truck assemblies of these cars, including freight cars, gondolas, hopper cars, refrigerator cars, and tank cars. There are two trucks in every railroad car consisting of four wheels, an axle, two frames, a bolster, a dampening device, and a spring grouping. The specifications and design of railroad car springs are prescribed by the American Association of Railroads and no change in the specifications and design of these springs has been made since 1936. There are only a few basic railroad designs of springs and customers order railroad springs by parts and reference numbers. Petitioner has available the blueprint showing the specifications for each type of spring used in railroad cars and keeps this blueprint on file at its plant. Any engineering work which petitioner *60 does with respect to springs is in connection with springs for industrial uses other than railroad cars. Many of the railroads and railroad car builders who are customers for petitioner's springs are located in the Chicago area. Included in petitioner's customers located in the Chicago area are Standard Car Truck Co., a corporation which manufactures the dampening device in a freight car truck, General American Transportation Corporation, a manufacturer of railroad tank cars, the Seaboard Coastline, the Union Pacific, the Santa Fe, and the Penn Central Railroad, as well as the Illinois Central, the Chicago-Milwaukee-St. Paul, the Chicago Rock Island Pacific, the Chicago Northwestern, and, during the years here in issue, the Burlington Railroad. The Pullman Company is also headquartered in Chicago. Thrall Car, a manufacturer of railroad cars, is headquartered in Chicago Heights. North American Car is headquartered in Chicago and American Car and Foundry is headquartered in St. Charles, Illinois. In 1959, Robert incorporated Freight Car for the purpose of operating in corporate form as a manufacturers' representative for products used in the railroad industry. Robert has been president *61 of Freight Car since its inception. This company sells products other than springs to the same railroad customers that purchase springs manufactured by petitioner. In addition to being the president and treasurer of petitioner during the years here in issue, Robert was also president of Russell Steel Products Company (Russell Steel). He held this position from some time prior to 1955 through part of the year 1969. Russell Steel was incorporated in 1951. During the years 1968 and 1969 Robert owned one-half of the capital stock of this corporation and two trusts for his minor children owned the remaining half of the stock. Russell Steel was a manufacturers' representative and among the manufacturers it represented was petitioner. In addition, Russell Steel had a manufacturing business. Robert P. Gooley was the manager of the manufacturing business. During the year 1969, Russell Steel adopted a plan of liquidation under section 337 and sold its physical assets and the inventory of its manufacturing operation to Robert P. Gooley on March 1, 1969. Russell Steel filed its final income tax return for the calendar year 1969 under the name R. S. Liquidation Company. The retained earnings *62 of R. S. Liquidation Company available for distribution to its shareholders at the end of 1969 were $ 371,869. H & S Sales Company (H & S Sales) was incorporated on November 28, 1969. Its first taxable year was a short period ending February 28, 1970. Its name was changed in its fiscal year ended February 28, 1971, to Robclif, Inc. Robert owned one-half of the capital stock of H & S Sales during its fiscal years ended February 28, 1970 and 1971 and the remaining one-half of the stock of this corporation was owned equally by trusts for Robert's two minor children. H & S Sales continued the activities of Russell Steel as a manufacturers' representative, including representing petitioner. From the time of its organization H & S Sales represented petitioner with respect to sales to some of petitioner's major customers, including General American Transportation Corporation and Pullman Company. Henry Miller Spring Sales Company (Henry Miller Sales) from 1951 through part of 1966 was a sales corporation. Its stock was owned by members of the Miller and Russell families. Henry Miller Sales made sales of petitioner's products. Robert, from 1951 through part of 1966, was an employee of this *63 company. During the years here in issue Robert operated as an individual as a manufacturers' representative and reported income and expenses from that operation on his income tax returns. The following schedule is a summary of the earnings reported by Robert on his Federal income tax returns for the calendar years 1951 through 1970: Railroad &
Symington
Wayne *
Henry Miller
Industrial
(Dresser
Pittsburgh*
Russell Steel
Year
Spring Sales
Products Co.
Industries)
Steel Wire
Products Co.
1951
17,716.55
9,200.00
17,500.23
1952
19,013.35
9,400.00
24,171.64
1,422.81
1953
16,719.19
9,400.00
36,763.07
1954
23,404.55
7,200.00
15,476.23
702.00
1955
9,479.08
7,200.00
25,494.13
2,000.00
1956
6,000.00
7,200.00
19,816.42
2,400.00
1957
6,000.00
12,000.00
43,905.34
204.97
600.00
1958
6,000.00
12,600.00
44,788.04
1959
6,000 .00
6,400.00
33,491.73
1960
6,000.00
70,387.38
1 961
6,000.00
130,468.00
1962
6,000.00
72,886.28
1963
6,000.00
12,000.00
1964
6,000.00
12,000.00
43,042.45
1965
6,000.00
12,000.00
61,567.43
1966
1,500.00
12,000.00
5,000.00
1967
12,000.00
6,000.00
1968
12,000.00
7,500.00
6,000.00
1969 12,000.00
1,000.00
1970
12,000.00
*64 Building
Spring and
Paul J. *
Amsler- *
Standard *
Year
Supply Co.
Mfg. Co.
Krez Co.
Morton
Forge
Total
1951
44,416.78
1952
54,007.80
1953
62, 882.26
1954
46,782.78
1955
44,173.21
1956
35,416.42
1957
62,710.31
1958
63,388.04
1959
7,200.00
53,091.73
1960
9,600.00
85,987.38
1 961
9,600.00
146,068.00
1962
9,600.00
88,486. 28
1963
49,200.00
1,000.00
68,200.00
1964
44,00 0.00
2,850.00
1,000.00
108,892.45
1965
24,000.00
29,453.76
133,021.1 9
1966
19,000.00
81,704.75
119,204.75
1967
18,00 0.00
132,539.89
168,539.89
1968
18,000.00
114,556.51
158,056.51
1969 18,000.00
167,554.31
2,918.33
201,472.64
1970
18,000.00
182,724.32
1,593.82
10,240.00
224,558.14
Robert Hoel for a number of years prior to 1969 had been an employee of Russell Steel. He was employed by that company as a salesman and upon the formation of H & S Sales he became its *65 president. On March 3, 1965, the directors of petitioner were Harold and Robert Russell, Elmer Miller, Peter Midock, and Robert Hoel. At that time the directors passed a resolution providing an annual salary for Robert, petitioner's president, of $ 15,600 and a bonus of 5 percent of petitioner's operating profits before deducting any officer's bonus. This resolution also provided an annual salary for Harold Russell, petitioner's vice president and treasurer, of $ 15,000 and a bonus of 5 percent of petitioner's operating profits before deducting any officer's bonus; an annual salary for Peter Midock, petitioner's vice president and assistant treasurer, of $ 12,000 and a 2-1/2 percent bonus; and an annual salary for Elmer Miller, petitioner's vice president, of $ 10,800 and a 2-1/2 percent bonus. These salaries and bonuses for Midock and Miller have continued through the taxable years here in issue. At a meeting on March 3, 1966, following Harold Russell's death when Robert was elected to the office of petitioner's treasurer, the directors voted an increase in Robert's salary to $ 20,000 per year and increased his bonus percentage from 5 percent to 10 percent. The directors present *66 at this meeting were Robert, Elmer Miller, and Peter Midock. During the years here in issue petitioner's directors included Robert, Robert Hoel, Peter Midock, Elmer Miller, and Robert Gooley who had been elected on April 7, 1966. Gilbert E. Morcroft has served as secretary of petitioner from its organization throughout the years here in issue. The following schedule shows the salaries, bonus percentages and amounts, and aggregate compensation of each of petitioner's principal officers for its fiscal years 1960 through 1970, exclusive of petitioner's contribution to its employee profit-sharing plan with respect to its officers: Henry Miller
Harold Russell
Peter Midock
Taxable
Total
Total
Total
Year Ended
Including
Including
Including
March
Salary
Bonus [1]
Salary
Bonus [2]
Salary
Bonus
1960
$ 20,000
$ 71,450
$ 12,000
$ 38,225
$ 10,200
$ 11,924
1961
20,000
60,800
12,000
32,900
10,340
11,974
1962
20,000
57,930
12,000
31,465
10,380
12,132
1963
13,000
67,943
12,000
41,347
10,440
12,192
1964
12,000
91,355
12,000
54,677
10,840
12,752
1965
8,000
60,033
[4] 13,000
54,220
12,000
20,030
1966
12,500
60,198
12,000
[7] 39,962
1967
12,000
46,647
1968
12,000
38, 533
1969
12,000
48,888
1970
12,000
52,681
*67 Robert Russell
Elmer Miller
Robert Hoel
[3]
Taxable
Total
Total
Year Ended
Including
Including
March
Salary
Bonus
Salary
Bonus
Salary
1960
$ 9,000
$ 10,524
1961
9,040
10,574
1962
9,180
10,732
1963
$ 1,000
$ 1,000
9,240
11,292
1964
1,500
1,500
10,090
12,852
1965
[5] 6,400
[6] 19,104
10,800
19,497
1966
[8] 16,333
[9] 78,405
10,800
[10] 38,789
$ 833
1967
20,000
133,373
10,800
44,897
10,417
1968
20,000
114,556
10,800
39,733
10,000
1969
20,000
167,554
10,800
47,688
10,000
1970
20,000
182,724
10,800
51,481
10,000
During petitioner's entire operations most of its sales, other than those made by Henry Miller Sales, have been made through manufacturers' representatives who have been paid a 5 percent commission on such sales. The following schedule shows the commissions paid by petitioner to its various representatives during its fiscal years 1961 through 1970: J Riley Russell (Later Fontana (Riley Mexican P/Y Ended Sherburne Steel Railway Singleton Van Mess Metal Wright Sales Co. Gould & Betts General General Pacific States ,momentum March 31 Kearney Co. Tate Co. Green Holrod Reynolds Products Co. Jacobs Co. Kidd Co. Spec. Co. Patjens Myers Singleton & Dove) Custard Co. Schmidt Barnes Jr. Supply Jr. in 1968) Assoc. Spring Standard Appliance Wolfe Equipment Supply Co. Chandler Orcutt Chynoweth H & S Sales Doremus Sales Grand Total 1961 $ 14,844.32 $ 11,161.46 $ 1,934.61 $ 8,242.87 $ 900.13 $ 1,337.94 $ 26,387.29 $ 1,038.04 $ 5,506.31 $ 3,078.14 $ 1,421.91 $ 19.14 $ 1,302.54 $ 7,789.88 $ 56.54 $ 1,905.24 *69 $ 134.12 $ 87,060.48
1962 19,349.31 6,672.46 1,744.05 1,539.96 1,531.00 1,561.43 25,253.70 2,380.90 2,377.15 2,722.80 1,997.58 53.99 2,417.53 $ 3,288.72 4,362.98 0 431.70 64.83 $ 362.00 $ 48.46 $ 1,289.65 $ 254.93 79,705.13
1963 22,580.03 0 2,437.74 0 1,434.25 3,002.19 44,022.85 2,201.31 782.15 2,917.19 760.80 38.22 4,039.08 6,775.00 0 266.53 0 $ 646.92 0 338.58 9,084.20 $ 250.29 $ 151.67 0 101,729.00
1964 24,618.18 0 2,212.33 0 1,719. 10 1,556.95 57,438.93 3,006.61 2,034.42 4,306.45 2,171.30 66.71 5,946.09 7,584.59 0 0 0 8.90 0 220.46 12,099.23 0 9,961.18 0 134,951.43
1965 28,588.50 0 5,023.05 0 1,154.16 1,93 9.65 61,600.44 2,791.63 4,356.79 2,024.55 4,151.64 141.31 10,432.56 0 0 0 0 66.76 0 794.57 12,604.27 0 23,228.33 0 $ 141.31 $ 1,784.87 160,824.39
1966 29,985.10 0 2,904.46 0 1,122.61 3,645.76 102,867.14 3,575.12 3,57 3.75 8.61 4,986.57 0 7,753.40 0 0 0 0 152.86 0 1,435.99 16,079.85 0 31,542.75 0 83.13 13,046.08 222,763.18
1967 29,325.13 0 3,518.83 0 1,006.25 3,274.65 95,965.30 5,113.28 2,600. 00 4.49.h3,036.80 0 7,821.33 0 0 0 0 344.14 0 4,263.92 13,174.80 0 29,792.35 0 411.46 3,880.72 201,533.45 *
1968 28,700.78 0 2,263.68 0 1,880.08 4,306.37 75,735.41 4,103.36 221.70 *70 2,074.30 4,155.42 0 7,408.54 0 0 0 0 113.92 0 (1,027.57 12,023.65 0 30,563.98 135.15 984.92 3,695.04 180,083.80
( 687.93 1969 34,187.30 0 3,416.30 0 2,809.18 3,948.70 104,876.70 5,461.3 9 4,951.75 2,388.53 122.53 0 8,323.46 0 0 0 0 572.08 0 2,817.52 22,684.80 0 32,436.66 0 249.76 5,328.78 $ 72.06 $ 1.80 $ 911.28 235,560.58
1970 40,738.33 0 375.35 0 3,005.82 4,457.14 23,889.9 4 4,466.80 4,156.24 2,671.99 0 9,044.24 0 0 0 0 958.90 0 2,780.46 27,736.53 0 43,859.75 0 0 3,028.91 $ 239.06 1,575.30 2,706.79 109,661.15 $ 96.08 $ 204.16 285,652.94 Petitioner did have some sales made other than through manufacturers' representatives and Robert Hoel during the years here in issue made some of these sales on behalf of petitioner. The following schedule shows sales made by petitioner to five selective customers during the years 1962 and 1969, together with the manufacturers' representatives who received commissions thereof: Sales
Customer
1962
1969
Representative
General American
$ 332,243.49
$ 487,226.36
Russell Steel
Transportation Corp.
Seaboard Coastline
5,693.22
49,335.13
General Standard Co.
R.R. Co.
Richmond Tank Car
822.06
119,635.32
Russell Steel
& Mfg. Co.
Standard Car Truck
188,708.54
909,829.64
Russell Steel
Co.
Union Pacific
5,938.17
93,362.36
General Standard Co.
Railroad Co.
*71 The following schedule shows the amount of petitioner's sales after returns and allowances, and its pre-tax net income, after-tax net income, and dividends paid for its fiscal years ended March 31, 1960 through March 31, 1970: Fiscal Year
Pre-Tax
After-Tax
Dividends
Ended March 31
Net Sales
Net Income *
Net Income
Paid
1960
$ 2,697,921
$ 328,088
$ 164,044
$ 20,000
1961
2,327,540
256,603
128,301
50,000
1962
2,220,074
233,923
116,961
65,000
1963 2,592,197
362,377
181,188
100,000
1964
3,808,737
549,492
274,746
150,000
1965
4,356,631
567,574
283,787
200 ,000
1966
5,634,697
775,529
426,412
200,000
1967
5,397,658
794,036
444,845
200,000
1968
4,737,90 3
661,145
329,372
175,000
1969
5,817,869
1,029,557
482,874
200,000
1970
7,036,430
1,086,708
534,490
200,000
Petitioner's manufacturers' representatives do not quote prices to customers, but all quotations for railroad and industrial springs are made by petitioner's office in Sharpsburg, Pennsylvania. Generally these quotations are made by petitioner's sales manager, the price quoted being that established by Robert with consideration *72 of the competitive situation in the industry. In the case of railroad springs, one of the five major industry producers would find it necessary to publish a new price list because of increased costs of material or labor or similar increased costs and since these increased costs were general in the industry, usually the other four manufacturers would shortly raise their prices to the same amounts. These springs are generally sold to the same customers by the five major companies in the business at the same price. Sometimes petitioner would be the first to raise the price and at other times other suppliers. Robert determined the price for petitioner's industrial sales to other than railroad car builders. He set these prices on the basis of a predetermined markup over costs. During the years here in issue, Peter Midock was in charge of the day-to-day management of petitioner's activities such as billing customers, quoting prices, approving design work, and handling certain labor negotiations. Midock also supervised the preparation of petitioner's payroll and the work of the white collar employees in the office. He generally signed petitioner's checks. Midock is a graduate of the University *73 of Pennsylvania with a degree in mechanical engineering. Elmer Miller's primary concern during the years here in issue was the operation of petitioner's manufacturing plant and its production line. His responsibility included the routine scheduling for production of springs and changes in that schedule in order to make deliveries of orders at the time required. The production employees are under his supervision. Robert, during the years here in issue and for all the years prior thereto, while he served as an officer of petitioner has maintained his office in Chicago, Illinois. His office in Chicago is also the office of Freight Car, Russell Steel, and later R. S. Liquidation Company and H & S Sales. Aside from Robert, there are in the Chicago office Robert Hoel, four salesmen, each of whom, with the exception of Robert Gooley, performed services for more than one of the corporations sharing the office, and three secretarial and clerical employees. During the years here in issue Robert exercised general supervision over all of petitioner's affairs. As president and treasurer he had the ultimate responsibility for petitioner's operations and finances, as well as its sales, and *74 approved its capital expenditures, labor contracts, and commission rates. Robert has been connected with petitioner's activities in some manner since the early 1950's. As an employee of Miller Spring Sales Company he was involved in sales activities on behalf of petitioner and also was involved in such activities in his connection with Russell Steel. Robert attended Purdue University prior to World War II and after serving in the military attended the University of Arizona. He completed all the work required for a degree in engineering, but because part of that work had been done in connection with military service was not awarded a degree. During 1954 and 1955 Robert did graduate work in business administration at the University of Chicago. During the years here in issue Robert actually visited petitioner's operation at Sharpsburg, Pennsylvania once or twice a month. He kept in daily contact with the plant by telephone, generally talking to Peter Midock with respect to any problems out of the ordinary. Robert was of the opinion that because of the location of many of petitioner's customers in Chicago he best served petitioner's interest by keeping his office in Chicago. Robert viewed *75 the most important aspect of petitioner's business as being its sales and its relationship with its customers. Many of petitioner's customers were entities to which Freight Car made sales of products other than petitioner's springs. During the years here in issue Robert personally handled the account of General American Transportation Corporation for Freight Car. This corporation was also a customer of Russell Steel and an ultimate customer for petitioner's products. During its fiscal years 1968, 1969, and 1970, Freight Car had gross receipts, gross profits, and taxable income and retained earnings as follows: Fiscal Year Ended
April 30
April 30
April 30
1968
1969
1970
Gross receipts
$ 318,910
$ 327,537
$ 532,602 *
Gross profits
318,910
327,537
450,994
Taxable income
227,505
236,256
369,349
Retained earnings
at end of fiscal
year
1,543,278
1,792,477
2,133,492
During its fiscal years ending April 30, 1968, 1969, and 1970, Freight Car paid to Robert and to Robert Hoel for reimbursement of travel and entertainment expenses the following amounts: Fiscal Year Ended
April 30
April 30
April 30
1968
1969
1970
Robert Russell
$ 25,696
$ 23,991
$ 24,396
Robert Hoel
6,675
8,433
9,224
*76 The tax return of Freight Car was audited for its fiscal year ended April 30, 1968, and Robert produced records to support the claimed deduction for travel and entertainment expenses paid to him. Robert spent approximately four hours a day in his Chicago office. In his absence, Robert Hoel handled any problems that arose in connection with petitioner's business if he was able to handle the matter. He also contacted persons at petitioner's plant or office to pass on directions from Robert. Both Robert and Robert Hoel attended various sales or trade conventions of customers of petitioner, as well as customers of Freight Car. Robert Hoel, during the years 1968, 1969, and 1970 received compensation for expense account allowances from Russell Steel or H & S Sales for the periods and in the amounts as follows: Expense
Account
Compensation
Allowance
Russell Steel Products Co.
1968
$ 7,200
$ 2,307
H & S Sales Company
December 1, 1969 to
February 28, 1970
8,488
11,573
March 1, 1970 to
February 28, 1971
7,200
8,257
During the years 1968, 1969, and 1970, Robert Hoel received $ 7,200 annually as salary from Freight Car. He received no expense *77 account allowances from petitioner during either of the years here in issue. During the years here in issue both Robert and Robert Hoel discussed problems with petitioner's manufacturers' representatives as such problems arose. Robert at times accompanied some of petitioner's manufacturers' representatives on visits to customers and whenever a problem such as whether a particular account should be credited to one or another of such representatives arose, Robert made the final decision. Standard Car Truck Company (Standard Car), one of petitioner's largest customers during the years here in issue, was considering a sale of its business. During the winter of 1968-1969, Robert had lengthy discussions with the owners of the stock of Standard Car and ultimately, in April 1971, Freight Car acquired the major portion of the stock of Standard Car. In the suite where Robert maintained his office in Chicago, Robert Hoel had an adjoining office. There was a secretary in the Chicago office, R. Devocelle, during the years here in issue whose salary ranged from $ 5,000 to $ 7,000 a year, her salary being paid by Freight Car. Robert Gooley, the vice president of Russell Steel, also had his *78 office in the suite where Robert and Robert Hoel had their offices. Prior to his acquisition of the manufacturing operation of Russell Steel, he was paid by Russell Steel a salary of approximately $ 14,300 a year. Four of the conglomerates which have divisions manufacturing steel springs and selling those products in direct competition with petitioner are Colt Industries, Union Corporation, Kuhlman Corporation, and Associated Springs. The following schedule shows the total sales of each of these companies of which steel springs was not the major item and the total compensations paid to the companies' chief executive officers in each of the years 1969 and 1970: 1969
1970
Total
Total
Company
Sales
Compensation
Sales
Compensation
Kuhlman Corp.
$ 55,843,000
$ 136,000
$ 49,939,000
$ 123,400
Union Corp.
61,640,000
72,200
72,102,000
84,600
Associated Springs
123,325,000
112,500
113,498,000
82,098
Colt Industries
729,214,000
148,000
665,637,000
225,000
The following schedule shows the average sales of 16 publicly-owned companies engaged in the railroad equipment business classifying these companies as to those with sales *79 of under $ 100 million, those with sales between $ 100 million to $ 500 million, and those with sales of over $ 500 million, together with the average compensation of the companies' presidents and the number of companies in each group for the years 1969 and 1970: 1969
Railroad Equipment
Sales Groups (in millions)
Under $ 100
$ 100- $ 500
Over $ 500
Average Sales
$ 49,007
$ 230,356
$ 746,041
Average President's
Total Compensation
94,051
125,557
148,828
Number of Companies
6
6
4
1970
Average Sales
$ 55,964
$ 273,882
$ 769,172
Average President's
Total Compensation
99,439
134,448
138,989
Number of Companies
7
5
4
Included in the group of railroad equipment companies as above set forth is General American Transportation Corporation which had sales of $ 312,217,000 in 1969 and $ 338,656,000 in 1970. The total compensation of the president of that corporation was $ 152,600 in 1969 and $ 152,400 in 1970. Also included in the railroad equipment companies as set forth above is Pullman Company which had total sales of $ 751,376,000 in 1969 and $ 711,580,000 in 1970, which company paid its president total compensation of $ 152,000 *80 in 1969 and $ 107,904 in 1970. During the years 1962 to 1970, the total number of railroad cars owned, new cars installed and rebuilt cars installed for both Class I railroads and all railroads including private lines, showed a gradual decline, as shown by the following schedule: All Railroads, Including
Class I Railroads
Private Lines
Total Cars
New Cars
New Cars
Rebuilt Cars
Year
Owned
Installed
Installed
Installed
1962
1,550,067
26,019
36,454
3,268
1963
1,512, 306
30,475
44,804
3,295
1964
1,488,385
55,865
69,051
13,936
1965
1,478,005
56,620
77,707
11,825
1966
1,488,1 15
65,112
89,899
15,954
1967
1,477,166
57,780
82,828
17,086
1968
1,453,883
38,953
55,964
12,604
1969
1,434,824
46,125
68,717
6,944
1970
1,423,921
45,265
65,881
9,255 However, during this period the size and capacity of railroad cars were increasing and the larger railroad cars being built in the latter part of the period 1962 to 1970 required more springs per car than the smaller cars which had been built in the earlier period. The following schedule shows the number of employees of petitioner and the category of their *81 employment for each of the fiscal years ended March 31, 1966 through March 31, 1970: Fiscal Year
Total
Ending
White Collar
Technical
Production
Employees
3/31/66
23
1
81
105
3/31/67
21
1
78
100
3/31/68
23
1
69
93
3/31/69
24
0
78
102
3/31/70
24
0
93
117
During the years 1969 and 1970 petitioner built a new warehouse which also contained some additional manufacturing space. Robert, as president of petitioner, authorized and gave final approval to this expansion program. During its fiscal years 1968 and 1969 petitioner's total telephone and telegraph expenses were $ 4,924 and $ 5,063, respectively, and its total deductions for travel expenses of officers and employees were $ 2,939 and $ 4,074, respectively. During each of its fiscal years ended March 31, 1969, and March 31, 1970, petitioner paid Robert Hoel a salary of $ 10,000 and paid to Robert a salary of $ 167,554 and $ 182,724, respectively, and in addition contributed to its qualified pension plan the amounts of $ 136,909 and $ 150,348, respectively, of which the amounts of $ 22,975 and $ 25,104 were apportioned to the credit of Robert. Petitioner on its Federal *82 income tax returns deducted the above amounts of salary payments to Robert and Robert Hoel and the amounts of contributions to its pension plan on behalf of Robert. Respondent in his notice of deficiency determined that $ 93,777 for the year 1969 and $ 101,362 for the year 1970 represented reasonable allowances of salary to Robert for services rendered to petitioner and therefore disallowed as unreasonable the amounts of $ 73,777 and $ 81,362, respectively. Respondent also disallowed amounts of the deduction taken by petitioner for contributions to its qualified pension plan. However, the parties now agree that these amounts are allowable except that in computing the total compensation paid by petitioner and the portion of the amount allowable as a deduction for payment to the plan on behalf of Robert, the salary of Robert which is determined in this case to be reasonable compensation for Robert's services to petitioner is to be used. Respondent by amendment to answer alleged that the entire $ 10,000 paid by petitioner as compensation to Robert Hoel in each of the years here in issue was excessive and not properly allowable as a deduction to petitioner and that any amount in excess *83 of $ 60,000 paid by petitioner to Robert Russell in each of these years is unreasonable and excessive and not properly allowable as a deduction to petitioner. Respondent claimed increased deficiencies in accordance with affirmative allegation in his amendment to answer. ULTIMATE FINDINGS
1. An amount of $ 10,000 in each of petitioner's fiscal years 1969 and 1970 was reasonable compensation for services rendered to petitioner by Robert Hoel. 2. Reasonable compensation by petitioner to Robert Russell for services rendered was $ 100,000 in its fiscal year 1969 and $ 110,000 in its fiscal year 1970. OPINION
Section 162(a) provides for the deduction by a taxpayer of ordinary and necessary expenses incurred in carrying on its trade or business including a reasonable allowance for salaries or other compensation for personal services actually rendered. It has long been recognized that whether amounts paid to a corporate officer, particularly where that officer is in control of the corporation *84 making the payments, constitute reasonable compensation is a question of fact to be determined by consideration not only of the nature of the corporate business but also the nature of the services rendered by the officer. Botany Mills v. United States,278 U.S. 282 (1929). The factors to be considered in arriving at the factual determination as to reasonableness of salaries have been outlined in numerous cases. We have often cited the criteria to be considered in making this determination as set forth in Mayson Mfg. Co. v. Commissioner,178 F. 2d 115, 119 (6th Cir. 1949), reversing a Memorandum Opinion of this Court. That case, after reciting that cases involving the question of reasonableness of salaries paid must be determined upon their own facts and circumstances, set forth as basic factors to be considered in reaching the decision in any case as the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing *85 general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. * * * See also Edwin's, Inc. v. United States,501 F. 2d 675, 677 (7th Cir. 1974). No one factor in any case is conclusive and the weight to be given to any particular fact in a case is a question of judgment. While a bonus plan based on a percentage of profit which was adopted by the board of directors in prior years is to be accorded some weight in determining the reasonableness of the salary paid this fact is not controlling, and particularly where the resolution providing for payment of a percentage of profit has remained unchanged it may no longer be realistic and reasonable when considered along with the other factors concerning the corporate business. Pepsi-Cola Bottling Co. of Salina, Inc.,61 T.C. 564, 568 (1974). *86 See also Harolds Club v. Commissioner,340 F. 2d 861 (9th Cir. 1965), affirming a Memorandum Opinion of this Court. Particularly is this true where the profit percentage is paid to the controlling stockholder of the corporation. See University Chevrolet Co.,16 T.C. 1452, 1455 (1951), affd. 199 F. 2d 629 (5th Cir. 1952), where we pointed out that "[for] a sole owner to pay himself a bonus as an incentive to do his best in managing his own business is nonsense." See also Irby Construction Company v. United States,290 F. 2d 824 (Ct. Cls. 1961), and Charles Schneider & Co., Inc. v. Commissioner,500 F. 2d 148, 153 (8th Cir. 1974), affirming a Memorandum Opinion of this Court. We recognize that neither Robert nor Robert Hoel personally owned any stock in petitioner. However, petitioner's stock was 80 percent owned by a corporation, the stock of which was owned 90 percent by Robert and 10 percent by Robert Hoel. Therefore, in viewing the so-called 10 percent bonus arrangement for Robert and the salary paid to Robert Hoel we must realistically consider where the control of petitioner lay. In this *87 case Robert Hoel testified that he spent 12 to 18 hours a week on business for petitioner. In explaining how this time was spent Robert Hoel was vague and therefore we have made no finding precisely as to the hours he spent in connection with petitioner's business. However, the notice of deficiency did not disallow any portion of the $ 10,000 paid to Robert Hoel as excessive and, since the question of the reasonableness of his salary was an affirmative issue raised by respondent, the burden of sustaining the affirmative allegation is on respondent. The record is clear that Robert Hoel did assist Robert with the management of petitioner. In fact, he was the only officer or employee of petitioner who had his office in Chicago where Robert's office was maintained. The record shows that Robert Hoel contacted the employees at petitioner's plant in Sharpsburg with respect to sales, or production problems arising in connection with sales, in Robert's absence and also at Robert's direction passed on various instructions to persons working at petitioner's plant. The record also shows that he made some direct sales for petitioner, thereby saving petitioner the 5 percent commission it would have *88 been necessary otherwise for petitioner to pay to a manufacturer's representative. While we do not think the record is sufficiently clear to support Robert Hoel's estimate of the quantity of these sales, in our view when this activity of Robert Hoel's is considered in connection with the other services he rendered for petitioner the record does support the conclusion that the $ 10,000 a year paid to him during the years here in issue was reasonable compensation for services actually rendered to petitioner by Robert Hoel. In reaching this conclusion we have not overlooked the fact stressed by respondent that Robert Hoel was also an employee of Freight Car which made sales to many of the same customers to which petitioner sold and that Robert Hoel was an officer of Russell Steel and later H & S Sales, both of which were manufacturers' representatives for petitioner. We have considered the fact that Robert Hoel's contacts in connection with Freight Car may well have been the motivating reason why he contacted the same customers in petitioner's behalf. However, this does not change the fact that he did make so-called "house sales" for petitioner, thereby making commission payments on *89 such sales unnecessary. Considering the record in this case as a whole, we have reached our conclusion as to the reasonableness of the salary paid by petitioner to Robert Hoel. The issue as to the amount of payment in each of the years here in issue which constitutes reasonable compensation for the services rendered by Robert is more difficult. Robert testified that he spent 40 to 60 hours a week on business for petitioner, that he spent 10 to 18 hours a week on business for Freight Car, and relatively a minimal amount of time on behalf of Russell Steel and his other business activities. Again we have made no finding based on this testimony, since the record as a whole clearly shows that many of the activities undertaken by Robert were with purchasers who were customers both of Freight Car and of petitioner. Robert testified about his travel and entertainment of customers on behalf of petitioner and, when it was called to his attention that he had substantial reimbursement for travel and entertainment expenses by Freight Car and no such reimbursements by petitioner, he attempted to explain the situation by stating that he supposed this was done for ease of administration since his *90 office was in Chicago and he had his own records there. He added that he thought it was insignificant whether these expenses were attributed to Freight Car or to petitioner since Freight Car was the majority stockholder of petitioner and to charge the amounts to the majority stockholder of petitioner in effect benefited petitioner's minority stockholder. In our view, however, this explanation is a demonstration of Robert's lack of differentiation between his operations for the benefit of petitioner and his operations for the benefit of Freight Car. This lack of distinction between the business of petitioner and the business of Freight Car is further emphasized by Robert's reference to his work on behalf of petitioner in purchasing the stock of Standard Car. The facts show that Freight Car purchased this stock. Aside from the actual time which Robert spent on petitioner's business during the years here in issue, the record does support the conclusion that he did manage petitioner's business well, even though it was with the assistance of two vice presidents who took care of the day-to-day operations of the business. Robert's testimony is clear that his major concern in connection *91 with petitioner was petitioner's sales at prices that would return a satisfactory profit percentage to the company. In this connection, although he did not do the day-to-day detail of production schedules or even of production costs and did not make all minute decisions as to product prices, he did carefully review costs and assumed the final responsibility for setting prices to provide what in his view was an adequate return to the company. Also, he assumed the final responsibility for new machinery and company expansion, all with the idea in mind of the areas in which new purchases and expansion were needed to meet sales demands that he anticipated for the company. The record here shows that prior to Robert's becoming president the company had a good sales and profit record and that its sales were on the increase. However, sales and profit continued to increase under Robert's supervision. Certainly some of the increase was due to the normal price increase made by all the companies engaged in selling steel springs to railroads or railroad car manufacturers as cost and sales prices in the industry generally increased. Robert himself testified to this effect. Also the record is inconclusive *92 whether the decrease in number of cars built is completely offset by the number of springs needed in the larger capacity cars which were being built in the industry. While there is no showing in this record of a correlation between petitioner's increased sales and Robert's services as petitioner's president and treasurer, see Dielectric Materials Co.,57 T.C. 587, 592 (1972), the record as a whole supports the conclusion that petitioner was well managed under Robert's general supervision. As to Robert's qualifications, the record shows that his long experience with petitioner, as well as his experience with his other businesses, was in the sales area. While there is nothing to indicate qualifications of Robert above and beyond those which would normally be expected from a chief executive officer of a corporation the size of petitioner, Robert's record of prior earnings in the sales area does support petitioner's position that he was of high ability in this area. The record here is also clear that petitioner's major business was not one of engineering or manufacturing complexity. Springs for railroad cars were manufactured under the specifications of the American *93 Association of Railroads, and the basic specifications for railroad springs had not been substantially changed since 1936. In short, we do not share respondent's view that Robert was a "part-time president" of petitioner, but rather conclude that he adequately performed his duties as president of petitioner regardless of whether the hours he spent in performing this work were as long as the hours spent by other chief executive officers of corporations the size of petitioner. Even though, in our view, Robert adequately performed the duties expected of a president of a corporation the size of petitioner, it does not follow that the amount of salary paid to Robert was reasonable for these services. Respondent offered the testimony of two expert witnesses, both of whom had extensive experience in recommending to various corporations rate ranges for compensation of executive personnel. Both of these witnesses concluded that an adequate salary for a president of a corporation with sales in the amount of petitioner's sales would be, if negotiated in an arms-length transaction, $ 60,000 a year for the years here in issue. We have considered the testimony of these two expert witnesses and *94 have weighed that testimony along with the documentary evidence that was introduced to support their conclusions. In our view these witnesses did not give adequate consideration to the profitability of petitioner's operation as compared to the level of petitioner's sales or to the fact that Robert served petitioner as treasurer as well as president. However, the conclusion of these witnesses that the amount paid to Robert was unreasonably high is adequately supported not only by their testimony as to the methods generally used in setting executive compensation, but also by documentary evidence on which they based that conclusion and the evidence in this case as a whole. The record shows the total salary paid to the presidents of four of the conglomerates which had divisions that directly competed with petitioner. If Colt Industries, which had total sales of three quarters of a billion dollars is eliminated, the salary paid to Robert in each of the years here in issue was well in excess of the salary paid to the presidents of conglomerates much larger than petitioner which had a division competing with petitioner, and the amount paid to Robert is larger than the average salary paid *95 to the chief executive officers of the four conglomerates, even if Colt Industries is included. Also, in addition to the salary paid directly to him, Robert had substantial sums paid into an employees' trust for his benefit. These contributions to the pension trust must be considered in determining the reasonableness of Robert's total compensation. Edwin's, Inc. v. United States,supra (501 F. 2d at 679). When the payments into the trust are added to the direct salary and bonus paid to Robert, the total is approximately $ 190,000 for petitioner's fiscal year 1969 and $ 207,000 for petitioner's fiscal year 1970. In comparing these amounts to the $ 94,000 and $ 99,500 average compensation paid to presidents by railroad equipment companies with sales averaging approximately ten times the average of petitioner's, and to the average amount paid to presidents of railroad equipment companies with sales running up to over $ 500 million, the indication is that the salary paid to Robert is not reasonable for the services he rendered to petitioner. We recognize that none of the so-called comparative companies used by respondent's expert witnesses in arriving at their judgment *96 of a reasonable salary for Robert are strictly comparable to petitioner. It would obviously be impossible to obtain any such strict comparability since, as Robert himself testified, all petitioner's major competitors are divisions of conglomerates. Respondent's experts offered some evidence as to the amounts paid to division managers and vice presidents in charge of sales of various large corporations. Even though this evidence shows that the amounts paid to these individuals were generally less than half of the salary paid to Robert by petitioner, we do not think such a comparison is indicative of the amounts which would be a reasonable salary for a chief executive officer with the added responsibility that such an officer carries for all the corporate activities. Particularly is this true when the company president is also its treasurer, as was the situation of Robert. Respondent's experts testified that generally a second-tier officer in a corporation would receive 70 to 75 percent of the salary of the chief executive officer. If the companies which were used by respondent's expert witnesses in showing the total remuneration to marketing vice presidents or vice presidents in charge *97 of sales, or division managers were strictly comparable to petitioner, this data might be more indicative of a reasonable salary for Robert to receive from petitioner. However, all of these companies had sales in excess of $ 60 million a year and many of them had sales in excess of $ 1 billion a year. The record does not show the profit of these companies or whether they competed for business in markets comparable to the market in which petitioner competed. While we have given some weight to the testimony of respondent's experts and have considered all the data submitted by them in support of the conclusions at which they arrived, even though we have incorporated in our findings only a limited amount of this data, we are not persuaded from this testimony that the $ 60,000 a year amount at which they arrived as reasonable compensation for Robert is proper or supported by all the evidence in this case. However, we do agree with respondent that the evidence here as a whole is sufficient to show that the amounts paid to Robert in each of petitioner's fiscal years 1969 and 1970 are excessive and, based on all the evidence, we have concluded that reasonable compensation for Robert for *98 these years is $ 100,000 and $ 110,000, respectively. Decision will be entered under Rule 155.
Footnotes
1. All references are to the Internal Revenue Code of 1954, unless otherwise noted.↩
*. Reported on Schedule C of individual returns filed by Robert Russell for years indicated.↩
1. Henry Miller bonus - 10% of pre-tax net income "Pre-tax net income" as the term is here used is operating profits before deducting any officer's bonus, contribution to the profit sharing trust, or taxes on income.
*↩
2. Harold Russell bonus - 5% of pre-tax net income *↩
4. Harold Russell salary increased to $ 15,000 per year effective 12/1/64 - Ex. 3-C. ↩
7. Bonus - 2 1/2% of pre-tax net income * effective 2/1/66 - Ex. 4-D. ↩
3. Robert Hoel never received a bonus. ↩
5. Salary of $ 15,600 per year effective 12/1/64 - Ex. 3-C. ↩
6. Bonus - 5% of pre-tax net income * effective 12/1/64 - Ex. 3-C. ↩
8. Salary increased to $ 20,000 per year effective 2/1/66 - Ex. 4-D. ↩
9. Bonus increased to 10% of pre-tax net income * effective 2/1/66 - Ex. 4-D. ↩
10. Bonus - 2 1/2% of pre-tax net income * effective 2/1/66 - Ex. 4-D.↩
*. Figure as stipulated by the parties.↩
*. Per tax returns.↩
*. Includes sale of inventory items, $ 81,608↩