T.C. Memo. 1996-136


UNITED STATES TAX COURT


WY'EAST COLOR, INC., AN OREGON CORPORATION, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 4195-93.                    Filed March 19, 1996.


Christopher H. Kent, Kevin O'Connell, and Steve Hval
(specially recognized), for petitioner.

Brenda M. Fitzgerald, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, Judge:  Respondent determined deficiencies in petitioner's Federal income tax of $223,038, $252,490, and $240,727 for fiscal years 1989, 1990, and 1991, respectively. After concessions, we must decide the following issues:

1.   Whether petitioner may deduct as management fees $284,300, $699,359, and $738,239 for fiscal years 1989, 1990, and 1991, respectively, as petitioner contends; $57,159, $149,175, and $155,559, as respondent contends; or some other amount.  We hold that petitioner may deduct 75 percent of the management fees it paid for those years, i.e., $213,000, $525,000, and $554,000.

2.   Whether (or to what extent) petitioner may deduct rent it paid to its sole shareholder for the sublease of property in excess of the rent its sole shareholder paid for the prime lease of the property.  Petitioner contends it may deduct rent of $216,000, $250,000, and $264,000 for fiscal years 1989, 1990, and 1991, respectively.  Respondent contends petitioner may deduct rent of $97,975 for each of those years.  We hold that petitioner may deduct rent of $120,087, $124,896, and $129,891 for fiscal years 1989, 1990, and 1991, respectively.

Section references are to the Internal Revenue Code in effect for the years in issue.  Rule references are to the Tax Court Rules of Practice and Procedure.  Unless otherwise stated, references to years are to calendar years and references to fiscal years are to petitioner's fiscal year, which ends on March 31.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A.   Petitioner

1.   Petitioner's Activities and Growth

Petitioner is an Oregon corporation the principal place of business of which is in Portland, Oregon.  Dwight A. Cummings (Mr. Cummings) owned all of petitioner's stock during the years in issue.  He and his family (the Cummings) founded petitioner and built it into a successful business.

Petitioner is a graphic arts prepress company.  It uses original art, photographs, and page layouts to prepare film to make plates for printing.  It also processes photographs for commercial photographers and makes large display prints.

Petitioner's workforce grew from 60-70 employees to 100-110 employees during the years in issue.  Petitioner had gross sales of about $12 million and had about 40 percent of the Portland market in the late 1980's.  For each year in issue, petitioner had retained earnings of $1 to $2 million.

Mr. and Mrs. Cummings organized petitioner into various departments.  There were three production departments: stripping, color, and planning.  Department managers reported to Mr. and Mrs. Cummings.  Mrs. Cummings held weekly management meetings.  Petitioner's managers did not have written employment contracts.

2. Petitioner's Management Employees

a. Grady Preston

Grady Preston (Preston) managed petitioner's color department during the years in issue. Preston is well informed about the technical aspects of petitioner's industry. He keeps current with new technology. Preston was responsible for electronics in his division, which was a large part of petitioner's operation. He tried to keep petitioner efficient and competitive. Petitioner paid Preston $55,874 in 1989, $59,832 in 1990, and $60,816 in 1991.

b. Steve Philps

Steve Philps (Philps) managed petitioner's color lab division during the years in issue. He worked 8 to 12 hours per day. Philps supervised film printing and processing, slide production, display material production, and some advertising, sales and customer relations. He also interviewed, hired, fired, trained, and supervised employees. Petitioner paid Philps $8,395 in 1989, $50,917 in 1990, and $49,823 in 1991.

c. Rick Capatosto

Rick Capatosto managed petitioner's planning department during part of the years in issue. He also handled the Payless account. Petitioner paid him $24,558.14 in 1989, $50,103.78 in 1990, and $51,997.67 in 1991.

d.   Larry Deal

Larry Deal (Deal) managed petitioner's planning department at some time during the years in issue.  Petitioner paid Deal $48,563.19 in 1989, $52,317.61 in 1990, and $54,536.14 in 1991.

e.   Jim Faust

Jim Faust (Faust) managed petitioner's planning department at some time during the years in issue.  Petitioner paid Faust $55,979.29 in 1989, $57,812.14 in 1990, and $60,059.19 in 1991.

3.   Management Fees, Sales, Assets, and Taxable Income

Petitioner did not deduct any officer compensation for the years in issue.  Petitioner deducted management fees of $284,300, $699,359, and $738,239 for fiscal years 1989, 1990, and 1991, respectively.  Petitioner deducted salaries and wages of $905,321, $1,092,762, and $1,293,692 for fiscal years 1989, 1990, and 1991, respectively.  Petitioner included in costs of goods sold, labor costs of $2,559,735, $3,048,681, and $3,836,954 for fiscal years 1989, 1990, and 1991, respectively.  Management fees as a percent of petitioner's salaries, wages, and labor, were 8.21 percent, 16.89 percent, and 14.39 percent in fiscal years 1989, 1990, and 1991, respectively.

Petitioner had sales, assets, and taxable income before deducting net operating losses and management fees and before adding to income deductions petitioner concedes are not allowable (taxable income before certain adjustments) as follows:

|  |  |  | Taxable Income |
| Fiscal |  |  | Before Certain |
| Year | Gross Sales | Assets | Adjustments |
| 1989 | $8,644,356 | $4,119,578 | $774,054 |
| 1990 | 10,283,552 | 5,106,452 | 1,154,903 |
| 1991 | 12,904,812 | 5,443,713 | 1,663,073 |

B.    The Cummings Family

Mr. Cummings is married to Karen R. Cummings (Mrs. Cummings).  Their children are Grant, Bruce, Dwight D. (Deen), Karen Ann, and Cynthia, who is married to Jim Medding (Medding).

1.    Mr. Cummings

Mr. Cummings lived in Redmond, Washington, during the years in issue.  Mr. Cummings knew the technology that affected petitioner's business.  He was president and a director of petitioner; Dacor, Inc. (Dacor), petitioner's management company (see par. C-1, below); and Lasercolor, Inc. (Lasercolor), another photographic processing business (see par. D, below).  He had offices at petitioner's Portland facility and at Lasercolor's Bellevue, Washington, facility, near Seattle.  Mr. Cummings did not keep records of how much time he worked for petitioner or Lasercolor.  He was a shareholder and officer of Kadac, Inc. (Kadac), petitioner's management company that succeeded Dacor (see par. C-2, below).  He reported on Kadac's income tax return that he devoted all of his time to Kadac.  He attended some of petitioner's weekly management meetings.  He helped decide which equipment petitioner would buy for the color lab.  Mr. Cummings served on the boards of the International Prepress Association

and DuPont Crossfield Users Group and as president and vice president of the Western States Prepress Conference.

### 2. Mrs. Cummings

Mrs. Cummings lived in Redmond, Washington, during the years in issue. She resigned as associate administrator for Children's Hospital in Seattle in 1986 to help manage petitioner. She was earning about $70,000 per year at Children's Hospital.

Mrs. Cummings performed services for petitioner in 1988 as an employee of Dacor. She was petitioner's general manager from 1989 to 1991. Mrs. Cummings interviewed all job applicants who passed petitioner's color laboratory manager's inspection.

Mrs. Cummings had offices at petitioner's Portland facility and at Lasercolor's facility in Bellevue, Washington. When in Portland, she lived at a house that petitioner owned. The previous occupants used the house as an office. Petitioner paid to remodel the house into a residence.

### 3. Deen Cummings

Deen Cummings worked for petitioner in 1988 and in 1989 until Kadac was formed. He then worked for Kadac. He began to live in Oregon in 1979. He performed services through Kadac for petitioner and Lasercolor during the years in issue. He worked 60 to 70 hours a week for Kadac in 1990 and 1991. He was on call 24 hours per day, 7 days per week. He managed petitioner's plant facilities and dispatch functions. He handled sales to one of

petitioner's major retail accounts.  In 1990 or 1991, he provided many more hours than usual of services to Lasercolor for 14 to 16 weeks.

### 4.  Grant Cummings

Grant Cummings was president of Kadac.  He performed services for Lasercolor and petitioner during the years in issue at Bellevue, Washington.

Grant Cummings worked full time for Kadac from May 1 to December 31, 1989, and in 1990 and 1991.  He worked 60 to 80 hours per week for Kadac during the years in issue.  He spent about 80 percent of his time working for Lasercolor and about 20 percent working for petitioner during the years in issue. Lasercolor and Kadac paid him as follows:

| Corporation | Year | Amount |
|-------------|------|--------|
| Lasercolor | 1988 | $41,365.34 |
| Lasercolor | 1989 | 45,795.39 |
| Kadac | 1989 | 10,000.00 |
| Kadac | 1990 | 55,000.04 |
| Kadac | 1991 | 68,900.04 |

He attended some of petitioner's management meetings during the years in issue.  He reported earning no income from services performed in Oregon in 1988, 1989, 1990, and 1991.

### 5.  Bruce Cummings

Bruce Cummings performed technical services for petitioner pertaining to telephones, computers, and lithography.  By 1991, he was project manager for a group of people who worked for Preston.  Bruce Cummings was a system operator for petitioner at

a time not specified in the record. He worked full time for Kadac in 1990 and 1991.

6. Karen Ann Cummings

During the years in issue, Karen Ann Cummings worked as a planner for petitioner's lithography department. She provided daily planning services (not otherwise described in the record) to petitioner. She attended some management meetings from 1988 to 1991.

7. Jim Medding

Medding married Cynthia Cummings, daughter of Mr. and Mrs. Cummings. In 1989, 1990, and 1991, Medding performed research and development for petitioner and was current with new technology. Kadac paid him $6,875 in 1990 and $59,387 in 1991.

C. Dacor, Inc. and Kadac, Inc.

Dacor and Kadac provided management services to petitioner and Lasercolor. Dacor and Kadac did not compare the salaries they paid to their employees to other salaries in the Portland area. Dacor did not have a written contract to perform services during the years in issue.

1. Dacor, Inc.

Mr. Cummings owned all of the stock of Dacor. Dacor did not pay dividends during the years in issue. Dacor provided services only to petitioner and Lasercolor. Dacor's fiscal year ended on March 31.

2.  Kadac, Inc.

Mr. Cummings formed Kadac to replace Dacor.  He incorporated Kadac in Nevada on April 28, 1989.  Mr. Cummings, Mrs. Cummings, and their sons, Deen, Grant, and Bruce, each owned 200 shares of Kadac stock.  Kadac and Lasercolor share facilities in Bellevue, Washington.  Kadac did not pay dividends during the years in issue.  Kadac provided management services to petitioner and Lasercolor.  Neither Dacor nor Kadac kept time sheets or other records of the services they or any member of the Cummings family performed for petitioner.  Kadac's taxable year ended on December 31 during the years in issue.

Kadac's only employee from 1989 to 1991 who was not related to the Cummings was Wendy Jo Goddard.

3.  Management Fees

Dacor received management fees of $276,266 in its fiscal year 1989 (ending March 31, 1989) and Kadac received $317,906, $806,658, and $881,820 in calendar years 1989, 1990, and 1991, respectively (a total of $2,282,650 from April 1, 1988 to December 31, 1991).[1]  Dacor paid officer compensation, salary,

---

[1] Petitioner deducted management fees totaling $1,721,890 for fiscal years (1989, 1990, and 1991); i.e., from Apr. 1, 1988, to Mar. 31, 1991.  The record does not indicate whether petitioner paid the $881,820 ratably throughout 1991.  If petitioner paid the $881,820 ratably throughout 1991, then Kadac would have received one-fourth of that amount ($220,455) by Mar. 31, 1991, and Dacor and Kadac would have received $1,621,285 from Apr. 1, 1988 to Mar. 31, 1991.

and wages of $152,296 in its fiscal year 1989 (ending March 31, 1989).  Kadac paid $194,430, $593,450, and $413,511, in 1989, 1990, and 1991, respectively (a total of $1,347,994 from April 1, 1988, to December 31, 1991), as shown below:[2]

| Payor | Calendar Year | Employee | Officer Compensation | Salaries and Wages | Totals |
|-------|------|----------|-------------|-------------|--------|
| Dacor | 1988 | Mr. Cummings | | $104,615 | |
| | | Mrs. Cummings | | 39,635 | |
| | | 1988 Total [Dacor] | | | $144,250 |
| | 1989 | Mr. Cummings | | [1]17,308 | |
| | | Mrs. Cummings | | 9,346 | |
| | | 1989 Total [Dacor] | | | 26,654 |
| Kadac | 1989 | Mr. Cummings | | 144,615 | |
| | | Mrs. Cummings | | 34,615 | |
| | | Grant Cummings | $10,000 | | |
| | | Karen Ann Cummings | | 5,200 | |
| | | 1989 Total [Kadac] | | | 194,430 |
| | | 1989 Total [Dacor and Kadac] | | | 221,084 |
| | 1990 | Mr. Cummings | | 360,000 | |
| | | Mrs. Cummings | | 45,000 | |
| | | Grant Cummings | 55,000 | | |
| | | Deen Cummings | 54,000 | | |
| | | Bruce Cummings | 40,500 | | |
| | | Karen Ann Cummings | | 26,382 | |
| | | Jim Medding | | 6,875 | |
| | | Wendy Jo Goddard | | 5,693 | |
| | | 1990 Total | | | 593,450 |
| | 1991 | Mr. Cummings | 110,000 | | |
| | | Mrs. Cummings | 45,525 | | |
| | | Grant Cummings | [2]70,000 | | |
| | | Deen Cummings | [3]57,793 | | |
| | | Bruce Cummings | 43,500 | | |
| | | Karen Ann Cummings | | 27,599 | |
| | | Jim Medding | | 59,387 | |
| | | 1991 Total | | | 413,804 |
| | | Total for 1988 - 1991 | | | 1,372,584 |

---

[2] The record does not indicate whether Kadac paid the $413,511 ratably throughout 1991.  If Kadac paid the $413,511 ratably throughout 1991, then Kadac would have paid one-fourth of that amount ($103,377.75) by Mar. 31, 1991, and Dacor and Kadac would have paid $1,037,860.80 from Apr. 1, 1988 to Mar. 31, 1991.

[1] The parties agree that Dacor paid these amounts to Mr. Cummings in 1989 and that Dacor paid $72,115 to Dwight Cummings in its fiscal year 1989 (Apr. 1, 1988 to Mar. 31, 1989).

[2] The parties stipulated that Kadac paid $70,000 to Grant Cummings in 1991 and that a Form W-2 for 1991 showed that Kadac paid him $68,900.04 in 1991. We find that Kadac paid him $70,000 in 1991. The $1,099.96 difference does not alter our analysis.

[3] Respondent determined that Kadac paid $57,793 to Deen Cummings. Petitioner contends that Kadac paid $57,500. We accept respondent's determination. The $293 difference does not alter our analysis.

D. Lasercolor, Inc.

Lasercolor was a Washington corporation that did business in Washington as Wy'East Color. Mr. Cummings acquired Lasercolor in 1988. He owned all of Lasercolor's stock during its fiscal years ending March 31, 1990 and 1991. Dacor filed a consolidated tax return with Lasercolor for its fiscal year ending March 31, 1989, on which Dacor reported that it owned Lasercolor. Lasercolor did not pay dividends during its 1989 fiscal year.

Lasercolor paid the following amounts for officer compensation, salaries and wages, and management services:

| Fiscal Year | Officer Compensation | Salaries and Wages | Management Services Paid to Kadac |
|---|---|---|---|
| 1989 | $72,115 | $206,002 | unknown |
| 1990 | none | 113,534 | $10,385 |
| 1991 | none | 102,769 | none |

E. Other Related Corporations

During the years in issue, Mr. Cummings owned 30 percent of Dynagraphics, a printing company in Portland, Oregon, that was one of petitioner's clients.

On its 1989 return, petitioner reported that it was a member of a controlled group of corporations which included Dacor, Lasercolor, and Visionworks, Inc.

On its 1991 return, petitioner reported that it was a member of a controlled group of corporations which included Lasercolor and Nevada Graphics, Inc. Mr. Cummings was president of those corporations. Kadac paid Mr. or Mrs. Cummings about half of their wage and salary income for 1991.

F. Oregon Income of the Cummings

Mr. and Mrs. Cummings reported on their Federal and Oregon income tax returns that they earned the following amounts from Dacor and Kadac:

| Year | Reported on Federal Tax Returns | Reported as Earned in Oregon |
|------|------|------|
| 1988 | $144,250.05 | $30,643 |
| 1989 | 188,593.84 | 43,961 |
| 1990 | 405,000.00 | 20,250 |
| 1991 | 155,525.00 | 19,069 |

The amounts reported as earned in Oregon in 1988 and 1991 were Mr. and Mrs. Cummings' earnings. The amounts reported as earned in Oregon in 1989 and 1990 were Mrs. Cummings' earnings. Mr. Cummings did not file Oregon individual income tax returns for 1989 or 1990. Deen filed Oregon tax returns for tax years 1988 to 1991. Grant Cummings did not file Oregon income tax returns for tax years 1988 to 1991. The State of Washington does not have an income tax.

G.    Petitioner's Lease of the 4200 S.W. Corbett Street Property

Petitioner is located at 4200 S.W. Corbett Street, Portland, Oregon (4200 S.W. Corbett St. property).  Before moving to 4200 S.W. Corbett Street, petitioner leased buildings at 4343 and 4321 S.W. Corbett Street (old property).  Petitioner leased the old property from Mr. Cummings, doing business as Blackstone,[3] under an oral, month-to-month lease.  The buildings on the old property had about 15,000 square feet.  Petitioner paid rent of $10,000 per month to Mr. Cummings.

In 1986, Mr. Cummings leased the 4200 S.W. Corbett St. property from the American Red Cross for 12 years with an option to buy.  The 4200 S.W. Corbett property was a three-story, wood frame building with about 33,631 square feet, a detached shop and storage building with 3,969 to 4,050 square feet, and an annex or residence with about 2,400 square feet.  Mr. Cummings paid rent of $8,164.61 per month ($97,975 per year) to the American Red Cross.  He agreed to pay real estate taxes, maintenance, and insurance expenses on the property.  The lease did not require Mr. Cummings to perform major repairs.

The 4200 S.W. Corbett St. property was zoned for high density multifamily residences.  Before Mr. Cummings leased the 4200 S.W. Corbett St. property from the American Red Cross,

---

[3] Mr. Cummings did business in the name of "The Blackstone Co." (Blackstone) before and during the years in issue.

petitioner obtained a revocable permit to use the property as a photo processing lab as the tenant of the American Red Cross. Petitioner paid all the expenses required to obtain the revocable permit.

Mr. Cummings sublet the 4200 S.W. Corbett St. property to petitioner before the years in issue. Petitioner spent about $1,000,000 to adapt the property for its use. Petitioner paid for insurance, maintenance, utilities, and other similar costs.[4]

Petitioner paid rent of $216,000 to Mr. Cummings for fiscal year 1989, $250,000 for 1990, and $264,000 for 1991.

Mr. and Mrs. Cummings deducted rent of $97,975 in 1988 and 1991, and taxes of $64,378 for 1988 and $90,626 for 1991. Mrs. Cummings deducted rent of $97,975 for 1989 and 1990, and taxes of $61,086 for 1989 and $101,048 for 1990. In 1994, Mr. Cummings paid about $100,000 to repair the roof and dry rot damage and to remove an oil tank.

---

[4] Petitioner contends that Blackstone paid real property taxes for the 4200 S.W. Corbett St. property. Petitioner relies on Exh. 20, which consists of copies of checks written by The Blackstone Co. from Feb. 14, 1989 to Nov. 14, 1991, and a memo to the file from petitioner's counsel dated Oct. 3, 1994, pertaining to tax accounts associated with particular pieces of property. Petitioner did not provide Exh. 20 to respondent in the time required by the Court's standing pretrial order. The parties stipulated that the information in the exhibit pertaining to tax accounts for the particular pieces of property is based on inadmissible hearsay. Thus, we do not consider Exh. 20.

OPINION

A.   Deductions for Management Fees

   1.   Contentions of the Parties

A taxpayer may deduct payments for management services under section 162 if the payments are for services actually rendered and are reasonable in amount.  American Sav. Bank v. Commissioner, 56 T.C. 828, 842-843 (1971).  This question is decided based on a consideration of all of the facts and circumstances of the case.  Id. at 843.  Petitioner bears the burden of proving that it may deduct the management fees it paid. Rule 142(a); Schaffer v. Commissioner, 779 F.2d 849, 857 (2d Cir. 1985), affg. in part and remanding in part Mandina v. Commissioner, T.C. Memo. 1982-34.

Petitioner deducted management fees it paid to Dacor and Kadac totaling $284,300, $699,359, and $738,239 for fiscal years 1989, 1990, and 1991, respectively.  Petitioner contends that it paid the management fees exclusively for personal services and that the fees are reasonable, ordinary, and necessary under section 162.

Respondent contends that the management fees were excessive. Respondent contends that part of the payments was for something other than services, such as disguised dividends, a transfer of wealth from Mr. Cummings to members of his family without gift tax consequences, or a means of evading Oregon income tax.

Respondent contends that petitioner may deduct only $57,159, $149,175, and $155,559 for those years.  Respondent determined these amounts based on the amount Dacor's and Kadac's employees reported on their Oregon income tax returns, increased by 30 percent for taxes and benefits.

  2.  Whether the Amount of Management Fees That Petitioner Paid Was Reasonable

The parties agree that we should apply the legal standards which govern whether compensation is reasonable to decide whether the management fees at issue here were reasonable.  More specifically, the parties agree that we should apply the factors in Elliotts, Inc. v. Commissioner, 716 F.2d 1241 (9th Cir. 1983), revg. and remanding T.C. Memo. 1980-282.  The factors are:  The importance of the employees who perform services to the success of the business; the character and condition of the company; the hypothetical investor's viewpoint; the consistency of payments for similar services within petitioner's business; and a comparison of amounts paid by other similar businesses for similar services.  We also consider petitioner's contention that comparing the management fees to petitioner's gross receipts shows that the management fees were reasonable.

No single factor determines whether the fees at issue were reasonable.  Pacific Grains, Inc. v. Commissioner, 399 F.2d 603, 606 (9th Cir. 1968), affg. T.C. Memo. 1967-7; Mayson Manufacturing Co. v. Commissioner, 178 F.2d 115, 119 (6th Cir.

1949), revg. and remanding a Memorandum Opinion of this Court. Whether the amount of management fees was reasonable is a question of fact. American Sav. Bank v. Commissioner, supra; see Elliotts, Inc. v. Commissioner, supra. Petitioner bears the burden of proving that the amount of management fees was reasonable. Rule 142(a). We evaluate the case by considering the total amount of management fees petitioner seeks to deduct, not the smaller amounts that Dacor and Kadac paid to various members of the Cummings family.

If the employee controls the employer, we closely scrutinize the reasonableness of compensation to see if it was paid for something other than the employee's services. Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1322-1324 (5th Cir. 1987), affg. T.C. Memo. 1985-267; Elliotts, Inc. v. Commissioner, supra at 1243; Charles Schneider & Co. v. Commissioner, 500 F.2d 148, 152-153 (8th Cir. 1974), affg. T.C. Memo. 1973-130; see also Dielectric Matls. Co. v. Commissioner, 57 T.C. 587, 591 (1972). An exploitable relationship may exist if the employees are the controlling shareholders or if a family relationship suggests that the compensation plan was not the result of a free bargain. Elliotts, Inc. v. Commissioner, supra at 1246; see Pacific Grains, Inc. v. Commissioner, supra at 607; Harolds Club v. Commissioner, 340 F.2d 861, 865 (9th Cir. 1965), affg. T.C. Memo. 1963-198. Petitioner and the Cummings did not

deal at arm's-length and the Cummings controlled Dacor, Kadac, and petitioner. Thus, we will closely scrutinize the reasonableness of the management fees petitioner paid.

3. Application of the Factors

a. Importance of Dacor and Kadac Employees to Petitioner

The positions that Dacor and Kadac employees held with petitioner, their hours and duties, and their importance to the success of petitioner are relevant to deciding whether management fees for their services are reasonable. Elliotts, Inc. v. Commissioner, supra at 1245; American Foundry v. Commissioner, 536 F.2d 289, 291-292 (9th Cir. 1976), affg. in part and revg. in part 59 T.C. 231 (1972); Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142, 1158 (1980).

Mr. and Mrs. Cummings and other members of their family built petitioner from a small prepress company to a successful firm. Mr. Cummings testified that petitioner is ranked in the top 25 of 2,000 prepress companies in the nation. Mr. and Mrs. Cummings, Deen, and to a lesser extent other Dacor and Kadac employees contributed to petitioner's success. However, there are no billing records for those services or records showing how much time Dacor and Kadac employees spent providing services to petitioner.

Oregon income tax returns filed by members of the Cummings family suggest that the Cummings did not provide services to

petitioner in Oregon to the extent they claim.  Oregon income tax law requires nonresident taxpayers who earned income from personal services rendered in Oregon to apportion their Oregon income based on the ratio of the number of days worked in Oregon for a business over the number of days worked in and out of Oregon for that business.  Or. Rev. Stat. sec. 316.127 (1993); Or. Admin. R. 150-316.127-(A)(3)(a)(A).

Mr. Cummings and two employees testified that Mr. Cummings spent a little more than 1 day a week in Portland.  However, Mr. Cummings did not file Oregon income tax returns in 1989 and 1990.  That suggests that he did not perform services for petitioner in Oregon during those years.

Mrs. Cummings testified that she worked in Oregon most of the time during the years in issue.  She reported in her Oregon income tax returns that she earned $43,961 in 1989 and $20,250 in 1990.  Dacor or Kadac paid her $43,961 in Oregon in 1989 and $45,000 in 1990.  This suggests that Mrs. Cummings worked full time for Dacor or Kadac in Oregon in 1989, but only about half time in 1990.  Petitioner did not adequately explain these apparent inconsistencies.

Mr. and Mrs. Cummings testified that they worked only for Kadac in 1991.  However, Kadac paid Mr. or Mrs. Cummings only about half of the wage and salary income they received in 1991.

Mr. and Mrs. Cummings did not explain this apparent inconsistency.

This factor favors petitioner somewhat.

b.    Character and Condition of the Company

A company's size as indicated by its sales, net income, or capital value, the complexities of the business, and general economic conditions is relevant in deciding whether management fees are reasonable. Elliotts, Inc. v. Commissioner, 716 F.2d at 1246; see E. Wagner & Son, Inc. v. Commissioner, 93 F.2d 816, 819 (9th Cir. 1937); General Water Heater Corp. v. Commissioner, 42 F.2d 419, 420 (9th Cir. 1930), affg. 14 B.T.A. 4 (1928).

Petitioner's performance improved during the years in issue. Petitioner's gross sales increased 18.96 percent in fiscal year 1990 and 25.49 percent in fiscal year 1991. Its total assets increased 23.96 percent in fiscal year 1990 and 6.6 percent in fiscal year 1991. Its taxable income increased 49.20 percent in fiscal year 1990 and 46.53 percent in fiscal year 1991. This factor favors petitioner.

c.    The Hypothetical Investor's Viewpoint

It is appropriate to consider whether the amount paid for management service is reasonable from the perspective of a hypothetical independent investor. Elliotts, Inc. v. Commissioner, supra at 1247. To calculate the return on investment, we divide taxable income before net operating losses

by the shareholder's equity for each fiscal year. See Universal Manufacturing Co. v. Commissioner, T.C. Memo. 1994-367 (citing Elliotts, Inc. v. Commissioner, supra at 1245). Petitioner reported the following:

| Fiscal Year | Taxable Income Before NOL's | Shareholder's Equity | Return on Investment |
|---|---|---|---|
| 1989 | $357,932 | $1,341,966 | 26.67% |
| 1990 | 435,637 | 1,518,957 | 28.68% |
| 1991 | 924,834 | 2,006,195 | 46.10% |

Petitioner's rate of return would satisfy a hypothetical investor. See Elliotts, Inc. v. Commissioner, supra at 1247 (an average return on equity of 20 percent would satisfy an independent investor). This factor favors petitioner.

> d. Comparison of Amounts Paid by Similar Businesses for Similar Services

Evidence that similar companies pay comparable amounts for similar work may indicate that compensation is reasonable. Elliotts, Inc. v. Commissioner, supra at 1246; see Hoffman Radio Corp. v. Commissioner, 177 F.2d 264, 266 (9th Cir. 1949); E. Wagner & Son, Inc. v. Commissioner, supra at 819. Neither party offered any evidence of the compensation that similar corporations pay for services similar to those performed by Dacor and Kadac. Because petitioner bears the burden of proof, Rule 142(a), this factor favors respondent.

e.     Consistency of Payments for Similar Services
       Within Petitioner

Evidence that a company pays controlling shareholders the same that it pays other employees for similar work may indicate that compensation is reasonable.  Elliotts, Inc. v. Commissioner, supra at 1247; Sunset Scavenger Co. v. Commissioner, 84 F.2d 453, 456 (9th Cir. 1936), affg. in part and revg. in part 31 B.T.A. 758 (1934).  Petitioner provided no convincing analysis whether management fees it paid to Dacor and Kadac were reasonable in relation to salaries it paid to its employees.

Petitioner contends that this factor favors petitioner because the amounts Dacor and Kadac paid to their employees were generally less or equal to the amounts petitioner paid to its department managers during the years in issue.  We disagree. Petitioner's argument does not explain why the full amount of the management fee petitioner paid to Dacor and Kadac is reasonable. Petitioner does not adequately explain why it is reasonable for management fees to substantially exceed Dacor's and Kadac's payments to the individuals.  If petitioner's payments to Kadac and Kadac's payments to its employees in 1991 occurred ratably throughout the year, then, for the period April 1, 1988, to March 31, 1991, petitioner's management fees paid to Dacor and Kadac totaled $1,721,890 and Dacor and Kadac's payments to their employees totaled $1,037,860.80.

It is difficult to compare the management fee and employee salary data in our record because some of it is based on fiscal years and some is based on calendar years. See footnotes 1 and 2 and accompanying text at par. C-3. However, it seems that the management fees were substantially larger than the total amount of salaries Dacor and Kadac paid to their employees.

     f.    Comparison of Management Fees to Gross Receipts

Courts have compared gross receipts to compensation in deciding whether compensation is reasonable. Elliotts, Inc. v. Commissioner, supra at 1246; Mayson Manufacturing Co. v. Commissioner, 178 F.2d at 119. Here, the management fees were 6.86 percent, 7.84 percent, and 17.69 percent of gross sales in fiscal years 1989 to 1991, respectively. Mr. Cummings' compensation was 1.9 percent, 3.5 percent and 0.9 percent of gross sales in fiscal years 1989 to 1991.

Petitioner contends that compensation of the key individual in a company is reasonable if it falls between 10 and 25 percent of gross sales. Petitioner cites RAPCO, Inc. v. Commissioner, T.C. Memo. 1995-128; Donald Palmer Co. v. Commissioner, T.C. Memo. 1995-65 (compensation was 31.4 percent of gross sales for Palmer; we allowed 5.5 percent); Acme Constr. Co. v. Commissioner, T.C. Memo. 1995-6 (compensation was 10.2 percent of gross sales for Horth); BOCA Constr., Inc. v. Commissioner, T.C. Memo. 1995-5 (compensation totaled 27.7 percent and 31.1 percent

of gross sales for 1989 and 1990); and Comtec Sys., Inc. v. Commissioner, T.C. Memo. 1995-4 (compensation was 28.1 percent of gross sales for Vernon Beard and 2.3 percent for Reda Beard). We disagree with petitioner's reliance on those cases. We did not calculate or consider compensation as a percent of gross sales or gross receipts in any of these cases except for BOCA Constr., Inc. v. Commissioner, supra. We calculated those percentages based on facts found in those cases. In those cases, we considered compensation as a percent of net sales, net profit, or gross profit, but not compensation as a percent of gross sales. RAPCO, Inc. v. Commissioner, supra; Donald Palmer Co. v. Commissioner, supra; Acme Constr. Co. v. Commissioner, supra; and Comtec Sys., Inc. v. Commissioner, supra.

In Donald Palmer Co. v. Commissioner, supra, we concluded that a salary equal to 58.2 percent of gross profit was reasonable because that percentage was similar to what the taxpayer had paid in prior years. Here, we have no evidence of management fees as a percent of gross profit that petitioner paid in prior years. Acme Constr. Co. v. Commissioner, supra, and Comtec Sys., Inc. v. Commissioner, supra, are unlike this case because some pay during the years in issue in those cases was catchup pay for prior years. Acme Constr. Co. v. Commissioner, supra, is unlike this case because the executive there personally guaranteed all of the taxpayer's debt. The taxpayers in Acme

Constr. Co. v. Commissioner, supra, and Comtec Sys., Inc. v. Commissioner, supra, also provided evidence comparing the compensation at issue with that paid by similar companies. There is no such evidence here. In BOCA Constr., Inc. v. Commissioner, supra, and RAPCO, Inc., v. Commissioner, supra, the taxpayer applied a longstanding bonus formula or compensation plan. There is no similar formula or plan in this case. In Comtec Sys., Inc. v. Commissioner, supra, the taxpayer provided evidence which compared the compensation at issue with compensation in a similar company. There is no similar evidence here.

Petitioner contends that this case is similar to Mortex Manufacturing Co. v. Commissioner, T.C. Memo. 1994-110. In that case, we found that it was important that the company had a longstanding compensation plan for its officer-stockholders that was well within industry norms. Petitioner did not make this showing. The taxpayer in Mortex provided evidence comparing the compensation at issue to various published surveys. Petitioner has submitted no such evidence.

Petitioner cites Universal Manufacturing Co. v. Commissioner, T.C. Memo. 1994-367, to show that Mr. Cummings' compensation from Dacor and Kadac was reasonable because it was 2.35 percent of net sales. Universal Manufacturing Co. v. Commissioner, supra, is similar to BOCA Constr., Inc. v.

Commissioner, supra, in that it states that compensation as a percentage of gross sales is one of the factors we may consider.

We disagree with petitioner's reliance on Universal Manufacturing Co. v. Commissioner, supra. The issue here is not whether Mr. Cummings' compensation is reasonable. It is whether the management fees petitioner paid to Dacor and Kadac were reasonable. Further, in that case, unlike here, part of the pay during the year in issue was catchup pay for prior years. The taxpayer in that case introduced evidence comparing the compensation at issue with that paid by other companies. Petitioner did not do so here. The executive in that case guaranteed the taxpayer's $2.8 million debt. There is no similar guarantee in this case. The cases petitioner cites do not show that the management fees at issue in this case are reasonable.

This factor favors petitioner.

### 4. Conclusion About Management Fees

We conclude that petitioner is entitled to deduct more management fees than respondent allowed for each year in issue, but that part of the management fees that petitioner paid during the years in issue was not reasonable. Considering the above discussion and the entire record, we hold that petitioner may deduct management fees of $213,000, $525,000, and $554,000 for fiscal years 1989, 1990, and 1991, respectively. This amount is

75 percent of the management fee rounded to the nearest thousand dollars.

B.   Whether Petitioner May Deduct Its Rent Payments to Mr. Cummings In Excess of the Rent He Paid to the American Red Cross

1.   Contentions of the Parties

Mr. Cummings paid rent of $97,975 per year ($293,925 for 3 years) to the American Red Cross for the 4200 S.W. Corbett St. property.  Mr. Cummings sublet that property to petitioner. Petitioner paid rent to Mr. Cummings of $216,000, $250,000, and $264,000 for fiscal years 1989, 1990, and 1991, respectively ($730,000 for 3 years).  Respondent contends that petitioner may not deduct more for rent than Mr. Cummings paid to the American Red Cross.  Petitioner contends that it may deduct all the rent it paid to Mr. Cummings in those years.

2.   Background

A taxpayer generally may deduct reasonable rents paid for property used in a trade or business.  Sec. 162(a)(3); Limericks, Inc. v. Commissioner, 165 F.2d 483, 484 (5th Cir. 1948), affg. 7 T.C. 1129 (1946).  A taxpayer who rents property from a related person may not deduct more than he or she would have paid if the parties had dealt at arm's-length.  Sparks Nugget, Inc. v. Commissioner, 458 F.2d 631, 635 (9th Cir. 1972), affg. T.C. Memo. 1970-74; Levenson & Klein, Inc. v. Commissioner, 67 T.C. 694, 715 (1977).  A taxpayer may deduct only the fair rental value of

premises it rents from related persons. Coe Lab., Inc. v. Commissioner, 34 T.C. 549, 585-586 (1960). We closely scrutinize whether rents exceed fair rental value if the lessor and lessee are related. B. Forman Co. v. Commissioner, 453 F.2d 1144 (2d Cir. 1972), affg. in part and revg. in part 54 T.C. 912 (1970); Sparks Nugget, Inc. v. Commissioner, supra; Limericks, Inc. v. Commissioner, supra. Fair rental value is a question of fact. Utter-McKinley Mortuaries v. Commissioner, 225 F.2d 870, 872-873 (9th Cir. 1955), affg. a Memorandum Opinion of this Court;[5] Mark R. Switz, Inc. v. Commissioner, T.C. Memo. 1979-162.[6] Petitioner bears the burden of proof. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

3. Rental From American Red Cross by Mr. Cummings

A price chosen after arm's-length bargaining close to the time of the valuation date is the best evidence of value. Estate

---

[5] In Utter-McKinley Mortuaries v. Commissioner, 225 F.2d 870 (9th Cir. 1955), affg. a Memorandum Opinion of this Court, the controlling stockholder leased the premises from a third party. The taxpayer corporation then sublet the premises and paid rent to the controlling stockholder that was three to four times as much as the controlling stockholder paid to the third party lessor. We held that the taxpayer corporation may not deduct the increased amount of rent because there was no business purpose for paying increased rent. The U.S. Court of Appeals for the Ninth Circuit affirmed our decision.

[6] In Mark R. Switz, Inc. v. Commissioner, T.C. Memo. 1979-162, Mark Switz (Switz) controlled the taxpayer-corporation. He leased property from a third party at a reasonable rental rate. He sublet the property to the taxpayer-corporation for more than twice that rate. We disallowed the deduction for rent to the extent it exceeded the rent Switz paid to the third party.

of Spruill v. Commissioner, 88 T.C. 1197, 1229, 1233 (1987); Utter-McKinley Mortuaries v. Commissioner, supra; Mark R. Switz, Inc. v. Commissioner, supra. There is no indication in the record that the lease from the American Red Cross to Mr. Cummings was not negotiated at arm's-length. Thus, the lease payment ($97,975) is highly probative evidence of rental value of these premises during the years in issue.

### 4. Respondent's Expert

Respondent's expert, Steve Pietka (Pietka), concluded that the fair rental values of the 4200 S.W. Corbett St. property were $120,087, $124,896, and $129,891 for fiscal years, 1989, 1990, and 1991, respectively.

Petitioner criticizes Pietka's comparables because they are not located near 4200 S.W. Corbett Street. We disagree because there are no similar leased properties in that area. Petitioner points out that its experts said that the fair rental values of Pietka's comparables in North Portland and Beaverton are generally lower than those in the 4200 S.W. Corbett Street area. We disagree for reasons stated in par. 5, below. We believe Pietka's comparables are more like the 4200 S.W. Corbett St. property than comparables considered by petitioner's experts.

Petitioner contends that Pietka did not consider the fact that petitioner could gradually move from the old property to 4200 S.W. Corbett Street. Petitioner did not state how much

value to attribute to this fact.  We are not convinced that it added more than a minimal amount, if any.

Petitioner criticizes Pietka's assumption that petitioner paid all of the expenses including real estate taxes.  However, petitioner did not prove otherwise.  Mr. Cummings' testimony that he paid the real estate taxes differs from his testimony in a prior unrelated case before the Oregon Tax Court.  In the Oregon Tax Court case, Mr. Cummings testified that petitioner paid the real estate taxes on the 4200 S.W. Corbett St. property.  We make no finding as to who paid those taxes.[7]

Petitioner offered documents showing that Mr. Cummings spent about $100,000 for repairs in the spring of 1994.  The documents were not admitted because they were exchanged too late (1 week before trial).  About 5 months before this case was calendared for trial, we sent a copy of the Court's standing pretrial order to the parties.  The standing pretrial order stated in part: "Any documents or materials which a party expects to utilize in the event of trial (except for impeachment), but which are not stipulated, shall be identified in writing and exchanged by the parties at least 15 days before the first day of the trial session."

Materials not provided in compliance with our pretrial orders are not admitted into evidence.  Rule 104(c)(2); see

---

[7] See supra note 7.

Freedson v. Commissioner, 565 F.2d 954 (5th Cir. 1978), affg. 65 T.C. 333 (1975) and 67 T.C. 931 (1977); McCoy v. Commissioner, 76 T.C. 1027 (1981), affd. 696 F.2d 1234 (9th Cir. 1983). Even if petitioner's documents had been admitted, we would give them very little weight because they apply to periods much later than the years in issue.

Petitioner contends that Pietka did not consider that Mr. Cummings made repairs. Petitioner points out that Mr. Cummings paid about $70,000 to repair the roof and dry rot in 1994. We make no findings about who paid for repairs during the years in issue. We would give little weight to evidence of who paid for repairs in 1994 because it occurred so long after the years in issue.

Petitioner contends that Pietka considered an incorrect amount of square footage for the 4200 S.W. Corbett St. property. The parties agree that the 4200 S.W. Corbett St. property included a 33,631 square-foot production facility. They disagree about the size of the other areas. Petitioner contends that the shop has 4,050 (rather than 3,969) square feet and that the annex or residence has 2,408 (rather than 2,316) square feet. These differences are de minimis.

Petitioner contends that Pietka did not consider all of the property that was subject to the lease. Petitioner argues that it leased property other than the 4200 S.W. Corbett St. property,

including a 840 square foot storage facility and 4,000 square feet from the old property. Petitioner bases this on Mr. Cummings' testimony that by 1989 petitioner rented about 4,000 square feet in the old building, and an additional 800 square feet from another building that Mr. Cummings, doing business as Blackstone, owns. Petitioner has not convinced us that its position about the rental area is correct. Petitioner's position is inconsistent with its expert's report. Petitioner's experts did not include a rental value for the 840 square-foot storage space or the 4,000 square feet in the old building. We believe Pietka considered all of the property that was subject to the lease.

5. Petitioner's Experts

Petitioner relied on the expert testimony of John Vissotzky (Vissotzky). Petitioner also called Steve Zenker, George Marandas, and Bruce Korter as expert witnesses, essentially to corroborate Vissotzky. We believe Vissotzky overestimated the fair rental value. He based his opinion on nine leases that he said were comparable. Most of the properties that he evaluated were buildings with several tenants, which had offices up to 5,000 square feet. Those spaces are considerably smaller than the 4200 S.W. Corbett St. property. Vissotzky's comparable properties were used as offices for professionals such as lawyers, doctors, and securities brokers. Only part of the

property leased by petitioner is used for offices.  Much of it is used for production and storage.  It also includes a residence.

Vissotzky only evaluated leases under which the landlord pays for insurance, maintenance, real estate taxes, and other similar costs.  Petitioner admits that it paid insurance, maintenance, and utilities.  Thus, Vissotzky's comparables are not like petitioner's facilities.

Vissotzky's fair rental value estimate includes the value added to the property by the $1 million petitioner spent to improve it.  We agree with Pietka's view that it is unreasonable to expect a tenant to pay for the rental value of improvements that the tenant made.

6.  <u>Petitioner's Claim That It Had Business Reasons for Paying More Rent to Mr. Cummings Than He Paid to the Red Cross</u>

Petitioner contends that it had substantial business reasons for paying more rent to Mr. Cummings than Mr. Cummings paid to the American Red Cross, unlike the taxpayers in <u>Utter-McKinley Mortuaries v. Commissioner</u>, 225 F.2d 870 (9th Cir. 1944), and <u>Mark R. Switz, Inc. v. Commissioner</u>, T.C. Memo. 1979-162. Petitioner contends that it had a business purpose in having a month-to-month rental instead of a 12-year lease.  Mr. Cummings testified that a 12-year obligation on petitioner's balance sheet would give petitioner a poor debt to equity ratio and hurt petitioner's banking relationships.  We are not convinced that

petitioner's banking relationships would have been hurt if petitioner had signed a 12-year lease.  For each of the years in issue, petitioner had retained earnings of from $1 million to $2 million.

Petitioner contends that it paid more rent to Mr. Cummings than Mr. Cummings paid to the Red Cross because petitioner had a month-to-month lease instead of a 12-year lease.  Mr. Cummings also testified that binding petitioner to one location for 12 years would hurt its ability to grow and move.  We believe that petitioner overstates the value of having a month-to-month lease, especially considering that petitioner had spent $1 million to adapt the property to its own needs.

Petitioner contends that a business reason for renting from Mr. Cummings is that it could pay rent late if necessary. However, petitioner had no right to pay rent late.  Petitioner in fact paid rent on time.  Petitioner's claim that Mr. Cummings might give it a break is entirely speculative.

The points cited by petitioner are far outweighed by the fact that it paid rent of $730,000 for the 3 years in issue instead of the $293,925 Mr. Cummings paid to the American Red Cross.

Petitioner contends that <u>W.H. Braum Family Partnership v. Commissioner</u>, T.C. Memo. 1993-434, is strikingly similar to the instant case.  We disagree.  That case did not involve a lease

between a controlling shareholder and a third party followed by a sublease by the controlling shareholder to the taxpayer corporation for substantially more rent. In W.H. Braum Family Partnership v. Commissioner, supra, the Braum family owned the properties that they leased to the taxpayer corporation. We found that the rent was not excessive.

7. Conclusion

Petitioner has not shown that Mr. Cummings did not pay fair rental value to the American Red Cross and has shown little or no business purpose to increase the rent. The facts of this case are similar to those in Utter-McKinley Mortuaries v. Commissioner, supra, and Mark R. Switz, Inc. v. Commissioner, supra, and the reasoning of those cases applies here.

To account for the points described above in pars. B-4, B-5, and B-6, we accept Pietka's conclusion of the fair rental value. We conclude that the petitioner may deduct rental payments of $120,087, $124,896, and $129,891 for fiscal years 1989, 1990, and 1991, respectively.

To reflect concessions and the foregoing,

Decision will be entered

under Rule 155.